Siobhan McIntyre (AK Bar No. 1206050)
Michelle D. Sinnott (AK Bar No. 1506049)
Brook Brisson (AK Bar No. 0905013)
TRUSTEES FOR ALASKA
121 W. Fireweed Ln., Suite 105
Anchorage, AK 99503
Phone: (907) 276-4244
smcintyre@trustees.org
msinnott@trustees.org
bbrisson@trustees.org

*Attorneys for Plaintiffs*

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| FRIENDS OF ALASKA NATIONAL WILDLIFE REFUGES, ALASKA WILDERNESS LEAGUE, NATIONAL WILDLIFE REFUGE ASSOCIATION, SIERRA CLUB, and WILDERNESS WATCH, <br><br> Plaintiffs, <br><br> v. <br><br> DOUG BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior, U.S. DEPARTMENT OF THE INTERIOR, KEVIN PENDERGAST, in his official capacity as Alaska State Director of the U.S. Bureau of Land Management, U.S. BUREAU OF LAND MANAGEMENT, SARA BOARIO, in her official capacity as Alaska Regional Director of the U.S. Fish and Wildlife Service, U.S. FISH AND WILDLIFE SERVICE, and KING COVE CORPORATION, <br><br> Defendants. | Case No. 3:25-cv-00318 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

(Alaska National Interest Lands Conservation Act, 16 U.S.C. § 3101 *et seq.*; National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*; Administrative Procedure Act, 5 U.S.C. §§ 702–06)

Plaintiffs Friends of Alaska National Wildlife Refuges, Alaska Wilderness League, National Wildlife Refuge Association, Sierra Club, and Wilderness Watch (collectively "Friends") file this Complaint for Declaratory and Injunctive Relief, alleging:

## I.    NATURE OF THE CASE

1.    This action is the third lawsuit brought by Friends, and their members and supporters, to protect their interests in the Izembek National Wildlife Refuge (Izembek or Refuge) and Izembek's designated Wilderness from the unlawful exchange of Refuge lands in violation of the Alaska National Interest Lands Conservation Act (ANILCA), the National Environmental Policy Act (NEPA), and the Administrative Procedure Act (APA).

2.    The Secretary of the U.S. Department of the Interior (Secretary) recently entered into a land exchange agreement (Exchange Agreement) with the King Cove Corporation (KCC) to trade away lands within Izembek's Wilderness for KCC-owned lands to allow for the construction of a road connecting the communities of King Cove and Cold Bay. This action challenges the Exchange Agreement and the Secretary's decision to enter into the Exchange Agreement for failing to comply with the ANILCA, NEPA, and the APA.

3.      The Federal Defendants did not follow the requirements of Title XI of

ANILCA, which provides the sole process for authorizing a road through Izembek and

requires approval by Congress. The exchange also does not further the purposes of

ANILCA, as required by section 1302(h). 16 U.S.C. § 3192(h)(1). In entering into the

Exchange Agreement, the Secretary failed to adequately justify the reversal in position

from prior Secretarial and agency decisions rejecting similar exchanges, contrary to the

APA. The Secretary also failed to comply with NEPA in executing the Exchange

Agreement.

4.      The Secretary's decision and the Exchange Agreement are arbitrary,

capricious, an abuse of discretion, otherwise not in accordance with law, or without

observance of procedure required by law. 5 U.S.C. § 706(2)(A), (D).

5.      Friends seeks vacatur of the Secretary's decision and Exchange Agreement.

6.      Because the U.S. Bureau of Land Management (BLM) issued a patent to

KCC pursuant to the Exchange Agreement concurrently with the Secretary's decision,

Friends also seek to invalidate, vacate, and set aside any appraisals, patents, and warranty

deeds authorized, executed, or issued to any party pursuant to the 2025 Exchange

Agreement, including, but not limited to U.S. Patent No. 50-2026-0001 (Oct. 22, 2025)

issued from the United States to KCC, and the warranty deed, Document No. 2025-

000209-0, Recording District: 305 – Aleutian Islands (Oct. 22, 2025), issued from KCC

to the United States and accepted by the U.S. Fish and Wildlife Service (Service).

Agreement for the Exchange of Lands Between King Cove Corporation and the United States (Oct. 21, 2025) [hereinafter 2025 Exchange Agreement]; U.S. Patent No. 50-2026-0001 (issued Oct. 22, 2025) [hereinafter Patent]; Warranty deed, No. 2025-000209-0, Recording District: 305 Aleutian Islands (Oct. 22, 2025) [hereinafter Warranty Deed].

## II.    JURISDICTION AND VENUE

7.      This Court has jurisdiction over the parties and subject matter of this action pursuant to 28 U.S.C. §§ 2201–02 (declaratory and injunctive relief), and 28 U.S.C. § 1331 (federal question jurisdiction).

8.      The Exchange Agreement, the Secretary's decision, Patent, Warranty Deed, and other implementing actions are final agency actions for which Friends has a right to judicial review under the APA. 5 U.S.C. §§ 702, 704.

9.      The sovereign immunity of Defendants Doug Burgum, in his official capacity as Secretary, the U.S. Department of the Interior (Interior), Kevin Pendergast, in his official capacity as Alaska State Director of BLM, BLM, Sara Boario, in her official capacity as Alaska Regional Director of the Service, and the Service is waived pursuant to the APA. 5 U.S.C. § 702.

10.     Venue is proper in the District of Alaska under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred within the District of Alaska and the Izembek Refuge is in Alaska.

## III.    PARTIES

### Plaintiffs

11.    Plaintiff Friends of Alaska National Wildlife Refuges is a nonprofit organization founded in 2005 and based in Anchorage, Alaska. It is a volunteer group that works to assist the Service to accomplish its congressionally mandated mission for the sixteen National Wildlife Refuges in Alaska. Its mission is to promote the stewardship of all Alaska National Wildlife Refuges through education, support, and advocacy, and to assist the Service through outreach to decision-makers. It has sent members and supporters to Izembek for volunteer projects in the past and is planning to organize future volunteer projects.

12.    Plaintiff Alaska Wilderness League is a nonprofit organization founded in 1993 to further the protection of public lands and waters in Alaska. Its mission is to lead the effort to preserve Alaska's wild lands and waters by engaging citizens and decision makers. It has offices in Anchorage and Washington, D.C., as well as other locations.

13.    Plaintiff National Wildlife Refuge Association is a nonprofit organization focused exclusively on protecting and promoting the 850-million-acre National Wildlife Refuge System, the world's largest network of lands and waters set aside for wildlife conservation. Founded in 1975, its mission is to conserve America's wildlife heritage for future generations through strategic programs that enhance the National Wildlife Refuge System and the landscapes beyond its boundaries. With approximately 80% of the land mass of the National Wildlife Refuge System in Alaska, the National Wildlife Refuge

Association has throughout its history focused significant resources on protecting and enhancing Refuge System resources throughout the state.

14. Plaintiff Sierra Club is the nation's oldest and largest grassroots environmental organization. Sierra Club is a national nonprofit organization with over 604,400 members dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. Sierra Club's concerns encompass a variety of environmental issues in Alaska and beyond, including an interest in protecting designated Wilderness. The Alaska Chapter of the Sierra Club has just over 1,200 members.

15. Plaintiff Wilderness Watch is a nonprofit organization founded in 1989. Its mission is to defend the nation's 111-million-acre National Wilderness Preservation System. Wilderness Watch advocates for appropriate stewardship according to the requirements of the Wilderness Act of 1964. Wilderness Watch monitors agency stewardship of designated Wilderness in Alaska and organizes its members to participate in public processes in Alaska that impact designated Wilderness.

16. Friends, their members, and their supporters have long-standing interests in protecting Izembek from a land exchange and road. These interests include preserving and enjoying the wildlife, habitat, and wilderness values of Izembek for recreational,

aesthetic, and environmental protection purposes. Friends' staff, members, and supporters have visited Izembek, enjoyed viewing its wildlife, and experienced the Wilderness and habitat that Izembek provides. Friends and their members have strong recreational, aesthetic, scientific, economic, and other interests in the wildlife that uses and depends on Izembek, including migratory birds and terrestrial mammals. Friends' staff, members, and supporters intend to return to Izembek to continue to view wildlife, recreate, hunt, and guide.

17.    Friends and their members and supporters have engaged in various past public processes, including NEPA, ANILCA Section 810, and other administrative processes, regarding a land exchange for a road to protect their interests in Izembek. They have also engaged in lobbying and other legislative work to protect their interests in Izembek. They would have engaged in a public process, environmental review, or congressional outreach regarding the Exchange Agreement had the Secretary and Interior undertaken a Title XI or NEPA process.

18.    Friends' and their members' and supporters' interests in Izembek are adversely affected by the Exchange Agreement. The removal of public lands and designated Wilderness from the National Wilderness Preservation System and the National Wildlife Refuge System to allow a road to be built harms the recreational, aesthetic, scientific, economic, and other interests of Friends and their members and supporters, who use and enjoy these lands and the wildlife that depends on them.

19.     The execution of the Exchange Agreement without following ANILCA
Title XI's, NEPA's, and APA's substantive and procedural requirements harms the
interests of Friends and their members and supporters in engaging in public processes and
informing agency decision-making.

20.     The purpose of this exchange is to "provide a corridor for the construction
and operation of a public road between King Cove and Cold Bay." 2025 Exchange
Agreement at 4. BLM has already patented lands located in the Izembek Refuge to KCC
for a road. KCC has indicated that it would pursue permitting of the road. *See* Maggie
Nelson, *King Cove Officials Say New Land Swap Agreement Brings Them Closer than
Ever to Building a Road to Cold Bay*, THE BRISTOL BAY TIMES (Nov. 3, 2025),
https://www.adn.com/bristol-bay-times/2025/11/03/king-cove-officials-say-new-land-
swap-agreement-brings-them-closer-than-ever-to-building-a-road-to-cold-bay/. The
removal of lands from Wilderness and federal ownership and use of these lands for road
construction further exacerbates the injuries to Friends and their members and supporters.
These actions harm Friends' and their members' and supporters' strong recreational,
aesthetic, scientific, economic, and other interests in Izembek.

21.     These actual, concrete injuries are fairly traceable to the Secretary's
decision to enter into the Exchange Agreement and failure to adhere to substantive
requirements and decision-making procedures, as well as federal defendants' actions to

execute a Patent to KCC and accept a warranty deed related to a land exchange for a road through Izembek. Friends' injuries would be redressed by the relief sought in this case.

<u>Defendants</u>

22.    Defendant Doug Burgum is the Secretary and is being sued in his official capacity. As the Secretary, he is charged with the supervision and management of all decisions, operations, and activities of Interior and its divisions. He is the official who signed the Exchange Agreement and issued the decision in support.

23.    Defendant Interior is an executive agency of the United States responsible for oversight of the National Wildlife Refuge System and other federal public lands.

24.    Defendant Kevin Pendergast is the Alaska State Director of BLM and is being sued in his official capacity. As the Alaska State Director, he is responsible for overseeing BLM's activities in Alaska. He is the official who signed the Patent. *See* Patent at 4.

25.    Defendant BLM is an executive agency of the United States within Interior. BLM is responsible for issuing the Patent. *See id.* at 1.

26.    Defendant Sara Boario is the Alaska Regional Director of the Service and is being sued in her official capacity. As the Alaska Regional Director, she is responsible for overseeing the Service's activities in Alaska. She is the official who signed acceptance of the warranty deed issued from KCC to the United States. *See* Warranty Deed at 3.

27.     Defendant Service is an executive agency of the United States within Interior. The Service is responsible for accepting warranty deed issued from KCC to the United States. *See id*. at 1, 3.

28.     Defendant King Cove Corporation is an Alaska Native Village corporation within the meaning of the Alaska Native Claims Settlement Act, 43 U.S.C. §§ 1601 *et seq.*, and organized under the laws of the State of Alaska. KCC holds the Patent to the lands conveyed pursuant to the Exchange Agreement. *See* 2025 Exchange Agreement at 5; Patent at 1. KCC is named as a Defendant to ensure Friends can obtain complete relief; no claims or legal violations are asserted against it.

## IV.    STATUTORY FRAMEWORK

29.     In 1960, Interior established the Izembek National Wildlife Range (Range) as a "refuge, breeding ground, and management area for all forms of wildlife" because of the importance of the area to waterfowl, brown bear, and caribou. Pub. Land Order 2216, Establishing the Izembek National Wildlife Range, 25 Fed. Reg. 12599, 12600 (Dec. 6, 1960).

30.     In 1980, Congress enacted ANILCA to "preserve unrivaled scenic and geological values associated with natural landscapes; to provide for the maintenance of sound populations of, and habitat for, wildlife species of inestimable value to the citizens of Alaska and the Nation, including those species dependent on vast relatively undeveloped areas; to preserve in their natural state extensive unaltered arctic tundra,

Case 3:25-cv-00318     Document 1     Filed 11/12/25     Page 10 of 59

boreal forest, and coastal rainforest ecosystems; to protect the resources related to

subsistence needs; to protect and preserve historic and archeological sites, rivers, and

lands, and to preserve wilderness resource values and related recreational opportunities . .

. ; and to maintain opportunities for scientific research and undisturbed ecosystems." 16

U.S.C. § 3101(b).

31. In enacting ANILCA, Congress also renamed the Range as the Izembek

National Wildlife Refuge and designated approximately 308,000 of the 315,000 acres as

Wilderness. Alaska National Interest Lands Conservation Act, Pub. L. No. 96–487, §§

303(3)(A), 702(6), 94 Stat. 2418 (1980).

32. Congress established Izembek because of its ecologically unique habitat

and wilderness characteristics. Specifically, Congress established Izembek for the

following purposes:

> (i) [T]o conserve fish and wildlife populations and habitats in their natural diversity including, but not limited to, waterfowl, shorebirds and other migratory birds, brown bears and salmonoids;

> (ii) [T]o fulfill the international treaty obligations of the United States with respect to fish and wildlife and their habitats;

> (iii) [T]o provide, in a manner consistent with the purposes set forth in subparagraphs (i) and (ii), the opportunity for continued subsistence uses by local residents; and

> (iv) [T]o ensure, to the maximum extent practicable and in a manner consistent with the purposes set forth in paragraph (i), water quality and necessary water quantity within the refuge.

*Id.* § 303(3)(B).

_____

*Friends of Alaska National Wildlife Refuges, et al. v. Burgum, et al.*
Case No. 3:25-cv-00318

33.     Title XI of ANILCA establishes a "single comprehensive statutory authority for the approval or disapproval of applications for [transportation and utility] systems" through Alaska public lands. 16 U.S.C. § 3161(c). This applies to roads constructed through conservation system units, including National Wildlife Refuges and designated Wilderness. 16 U.S.C. § 3162(4)(A).

34.     Title XI of ANILCA requires that transportation facilities "be approved or disapproved in accordance with the procedures set forth in this subchapter." *Id.* § 3162.

35.     Transportation systems may not be authorized through designated Wilderness without a recommendation by the President and approval by Congress. 16 U.S.C. § 3166(b), (c).

36.     One purpose of Title XI is to consider potential routes for the transportation system unit. 16 U.S.C. § 3164(g)(2)(B).

37.     Title XI's procedures are mandatory: "Notwithstanding any provision of applicable law, no action by any Federal agency under applicable law with respect to the approval or disapproval of the authorization, in whole or in part, of any transportation or utility system shall have any force or effect unless the provisions of this section are complied with." *Id.* § 3164(a).

38.     ANILCA authorizes the Secretary to acquire inholdings in conservation system units to further the purposes of those units, without resorting to condemnation proceedings. *See* 16 U.S.C. § 3192.

39.     ANILCA provides that "the Secretary is authorized, consistent with other applicable law in order to carry out the purposes of this Act, to acquire by purchase, donation, exchange, or otherwise any lands within the boundaries of any conservation system unit." *Id.* § 3192(a).

40.     The Secretary is permitted to exchange lands under ANILCA "on the basis of equal value" or, if the parties agree to an unequal-value exchange, the Secretary must determine that the exchange is in the public interest. *Id.* § 3192(h)(1).

41.     ANILCA Section 1302(h) mandates that the Secretary is authorized to acquire lands for the purposes of the Act via exchange. *Id.*

42.     To execute an exchange under ANILCA section 1302(h), the Secretary must find that the land is being acquired for ANILCA's general purposes, Izembek's specific purposes including Wilderness, as well as the purposes of the Range. *Id.*

43.     The Wilderness Act was enacted to protect for "present and future generations the benefits of an enduring resource of wilderness" and establish the National Wilderness Preservation System to protect areas and provide for their use and enjoyment as unimpaired Wilderness. 16 U.S.C. § 1131(a).

44.     Congress directed that Wilderness be managed to preserve its wilderness character, and it devoted Wilderness to "the public purposes of recreational, scenic, scientific, educational, conservation, and historical use." 16 U.S.C. § 1133(b); *see also*

ANILCA § 707 ( "[W]ilderness designated by this Act shall be administered in accordance with applicable provisions of the Wilderness Act . . . .").

45.     The Wilderness Act provides that

[e]xcept as specifically provided for in this Act, and subject to existing private rights, there shall be . . . no permanent road within any wilderness area designated by this Act and, except as necessary to meet minimum requirements for the administration of the area for the purpose of this Act . . . , there shall be . . . no use of motor vehicles, motorized equipment or motorboats, no landing of aircraft, no other form of mechanical transport, and no structure or installation within any such area.

16 U.S.C. § 1133(c).

46.     The mission of the National Wildlife Refuge System is "to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans." 16 U.S.C. § 668dd(a)(2).

47.     Refuges must "be managed to fulfill the mission of the System, as well as the specific purposes for which that refuge was established." *Id.* § 668dd(a)(3)(A); *see also id.* § 668dd(a)(4)(B), (D) (requiring the Secretary to administer the refuge to achieve the purposes of the refuge and the mission of the Refuge System); ANILCA § 304(a) ("Each refuge shall be administered by the Secretary . . . in accordance with the laws governing the administration of units of the National Wildlife Refuge System, and this Act.").

_____

*Friends of Alaska National Wildlife Refuges, et al. v. Burgum, et al.*
Case No. 3:25-cv-00318

48.     NEPA requires federal agencies to prepare a detailed environmental impact statement (EIS) for every major federal action that will have a significant impact on the quality of the human environment. 42 U.S.C. § 4332(2)(C).

49.     Such a statement is required to consider any "reasonably foreseeable environmental effects of the proposed agency action[,]" "any reasonably foreseeable adverse environmental affects which cannot be avoided should the proposal be implemented[,]" and "a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal." *Id.*; *see also id.* § 4332(F) (separately requiring agencies to "study, develop, and describe technically and economically feasible alternatives").

50.     The APA provides for judicial review of actions taken by administrative agencies. 5 U.S.C. §§ 702, 704.

51.     The APA instructs a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or are "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

52.     When an agency reverses a prior decision, the agency is "obligated to supply a reasoned analysis for the change." *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v.*

*State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). An agency change in position is arbitrary and capricious under the APA unless the agency (1) displays "awareness that it is changing position," (2) shows that "the new policy is permissible under the statute," (3) "believes" the new policy is better, and (4) provides "good reasons" for the new policy, which, if the "new policy rests upon factual findings that contradict those which underlay its prior policy," must include "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009); *see also Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc).

## V.   IZEMBEK REFUGE HISTORY AND VALUES

53.    Izembek has been recognized for decades as an area with particularly valuable wildlife habitat.

54.    Efforts to protect Izembek began in the early 1940s. Interior first designated the Range for protection in 1960, recognizing that it "contains the most important concentration point for waterfowl in Alaska." Press Release, Off. of the Sec'y, Dep't of the Interior, Secretary Seaton Creates Izembek National Wildlife Range in Alaska (Dec. 7, 1960).

55.    The Range's importance was reaffirmed in 1980, when Congress renamed the Range as the Izembek National Wildlife Refuge and designated approximately

---

308,000 of the 315,000 acres as Wilderness. Alaska National Interest Lands Conservation Act, Pub. L. No. 96–487, §§ 303(3)(A), 702(6), 94 Stat. 2418 (1980).

56.     Congress established Izembek because of its ecologically unique habitat and wilderness characteristics. Specifically, Congress established Izembek for the following purposes:

> (v)     [T]o conserve fish and wildlife populations and habitats in their natural diversity including, but not limited to, waterfowl, shorebirds and other migratory birds, brown bears and salmonids;
>
> (vi)    [T]o fulfill the international treaty obligations of the United States with respect to fish and wildlife and their habitats;
>
> (vii)   [T]o provide, in a manner consistent with the purposes set forth in subparagraphs (i) and (ii), the opportunity for continued subsistence uses by local residents; and
>
> (viii)  [T]o ensure, to the maximum extent practicable and in a manner consistent with the purposes set forth in paragraph (i), water quality and necessary water quantity within the refuge.

*Id.* § 303(3)(B).

57.     When drafting ANILCA, Congress noted:

The Izembek Wilderness possesses outstanding scenery, key populations of brown bear, caribou and other wilderness-related wildlife, and critical watersheds to Izembek Lagoon. About 68 percent of the total lands in Izembek Lagoon are covered with the largest eelgrass beds in the world. These beds are utilized by millions of waterfowl for migration and wintering purposes. A wilderness designation will protect this critically important habitat by restricting access to the lagoon.

H. R. Rep. No. 96-97, Part II, at 136 (1979).

_____

*Friends of Alaska National Wildlife Refuges, et al. v. Burgum, et al.*
Case No. 3:25-cv-00318

58. Izembek is one of the world's most important migratory bird staging and wintering habitats, supporting millions of migratory waterfowl and shorebirds in its coastal lagoons and freshwater wetlands complex. *See* U.S. FISH & WILDLIFE SERV., IZEMBEK NATIONAL WILDLIFE REFUGE LAND EXCHANGE/ROAD CORRIDOR FINAL ENVIRONMENTAL IMPACT STATEMENT 3-105 (2013) [hereinafter 2013 Final EIS].

59. Izembek and its adjacent wetlands and nearshore marine environment provide habitat for several species protected under the Endangered Species Act (ESA), such as the Steller's eider, northern sea otter, and Steller sea lion. *Id.* at 3-172, 3-179, 3-184.

60. Izembek also provides high quality brown bear, wolf, and caribou habitat. *See id.* at 3-141, 3-145, 3-153. In particular, the Joshua Green River watershed supports the highest concentration of brown bears for the lower Alaska Peninsula. *Id.* at 3-141. Izembek's isthmus is an important migration corridor and provides wintering habitat for the Southern Alaska Peninsula caribou herd. *Id.* at 3-145.

61. Izembek is internationally-recognized for its unique and ecologically significant wetlands and wildlife. It was designated as a Wetland of International Importance by the Ramsar Convention on Wetlands of International Importance in 1986 ("Ramsar Convention"). *Id.* at 3-105. The Ramsar Convention is an international treaty, adopted by the United States, with a stated mission of conservation and wise use of all wetlands through local and national actions and international cooperation. *Id.* at 3-46.

# VI. HISTORY OF LAND EXCHANGE PROPOSALS AND EXCHANGE AGREEMENT

62. Interior and the Service have evaluated the effects of a road from King Cove to Cold Bay multiple times.

63. In the early 1980s, Interior conducted an analysis of a road through Izembek, concluding that a road could cause long-term damage to the Refuge's unique and ecologically important habitats. *See* U.S. FISH & WILDLIFE SERV., KING COVE ROAD BRIEFING REPORT 2 (Mar. 1996) [hereinafter King Cove Road Briefing Report].

64. In 1985, Interior acknowledged that a road through the Izembek Wilderness could only be built with congressional approval under Title XI of ANILCA. DEP'T OF INTERIOR, BRISTOL BAY REG'L MGMT. PLAN AND FINAL ENVIRONMENTAL IMPACT STATEMENT 8-160 (1985) [hereinafter Bristol Bay RMP]; *see also* DEP'T OF INTERIOR, RECORD OF DECISION FOR THE IZEMBEK NAT'L WILDLIFE REFUGE COMPREHENSIVE CONSERVATION PLAN, 121 (August 1, 1985) (noting that congressional approval will be required to build a road across the Izembek Wilderness).

65. In 1985, Interior also concluded that "[t]he presence of a road [connecting King Cove and Cold Bay], vehicular traffic, and intensified human use could alter migratory patterns" of the "nearly 6,000–7,000" caribou that migrate through the isthmus twice a year between their wintering range and calving grounds, and that roads built in other areas of the state have "pose[d] a serious barrier to caribou movements." Bristol Bay RMP at 8-32.

66.     Interior further found that a road "would result in expanded human

presence and traffic . . . provid[ing] greater access into a relatively remote, undisturbed

region in the Joshua Green River drainage and in key bear use areas in Right and

Lefthand valleys" such that "[b]ears could be expected to change their behavior . . . and

might abandon some traditional use areas." *Id.* at 8-38.

67.     Interior concluded that "[t]he King Cove-Cold Bay road could have major,

local impacts" to wilderness values. *Id.* at 8-69.

68.     In 1996, the Service again addressed the issue of a road through Izembek

and again found that a road would have unacceptable environmental impacts. King Cove

Road Briefing Report at 2.

69.     In 1997, KCC offered to exchange KCC lands at the mouth of the Kinzarof

Lagoon for a right-of-way through Izembek. The Service declined the offer because of

adverse impacts of a road to wildlife. U.S. FISH & WILDLIFE SERV., LAND PROTECTION

PLAN FOR IZEMBEK NATIONAL WILDLIFE REFUGE Complex, COLD BAY, ALASKA 53

(1998) [hereinafter Land Protection Plan].

70.     Also in 1997, Senator Frank Murkowski introduced a bill that would have

required the Secretary to allow road construction through Izembek. King Cove Health

and Safety Act of 1997, S. 1092, 105th Cong. § 2(a) (1997). That bill was amended and

eventually enacted as part of an appropriations act. Instead of mandating a road, the

legislation expressly prohibited a road and authorized $37.5 million for various non-road

Case 3:25-cv-00318     Document 1     Filed 11/12/25     Page 20 of 59

projects to improve health and safety infrastructure and services in King Cove, including $2.5 million for improvements to the King Cove medical clinic. Omnibus Consolidated and Emergency Supplemental Appropriations Act, Pub. L. No. 105–277, § 353, 112 Stat. 2681, 302–03 (1998) (specifically prohibiting the construction of any road or other facilities within Izembek).

71.    One of the projects Congress authorized was the purchase of a hovercraft and construction of a hovercraft facility outside of the Refuge. *Id.*

72.    In 1998, the Service stated that the proposal to build a road was "the greatest known potential threat to wildlife and wilderness values within the Izembek complex." Land Protection Plan at 53. The Service again noted the "significant wildlife and wilderness resources in the area," including important wintering area and migration corridor of caribou, an adjacent "key brown bear natal area that supports the highest densities of bears on the lower Alaska Peninsula," and "outstanding and essential habitat for a variety of species, including the threatened Steller's eider, Pacific black brant, tundra swan and emperor goose." *Id*.

73.    From 2001 to 2004, the U.S. Army Corps of Engineers (Corps) completed a NEPA review for the King Cove Access Project. *See* U.S. FISH & WILDLIFE SERV., RECORD OF DECISION IZEMBEK NAT'L WILDLIFE REFUGE LAND EXCHANGE/ROAD CORRIDOR 6 (2013) (hereinafter 2013 ROD). As part of the analysis, the Corps concluded

that a hovercraft operating between terminals near King Cove and Cold Bay was the preferred alternative. *See id.*

74. Following the Corps' analysis and decision, the Aleutians East Borough (Borough) purchased a hovercraft with appropriated federal funds and constructed a road from King Cove to a hovercraft facility at Lenard Harbor and then beyond to a more northern hovercraft landing, the Northeast Terminal, at the border of Izembek Refuge. *Id.*; *see also* 2013 Final EIS at 2-7. The hovercraft began operating from the Lenard Harbor facility in 2007 and successfully completed "at least 22" requested medical evacuations during its operation. 2013 ROD at 6; *see also* 2013 Final EIS at 2-7.

75. The Borough suspended hovercraft operations in 2010, citing unreliability and cost, despite calling the hovercraft a "life-saving machine . . . doing what it is supposed to do." THE WILDERNESS SOCIETY, HISTORY OF THE PROPOSED ROAD THROUGH IZEMBEK NATIONAL WILDLIFE REFUGE 2 (2014). The Borough then sold the hovercraft but continued to advocate for construction of a road through Izembek. Letter from Stanley Mack, Mayor, Aleutians East Borough, to Kevin Morgan, Div. Chief, Alaska Dist., Regul. Div., U.S. Army Corps of Eng'rs (Feb. 24, 2012). If a land exchange for a road through the Refuge was not ultimately pursued, the Borough told the Corps that the facility would be used for a landing craft or passenger ferry instead. *Id.*

76. During this same time, new bills were introduced in Congress that proposed to mandate a land exchange to allow for road construction through Izembek. *See* Izembek

and Alaska Peninsula Refuge and Wilderness Enhancement Act, S.1680, 110th Cong. § 4 (2007); Izembek and Alaska Peninsula Refuge and Wilderness Enhancement and King Cove Safe Access Act, H.R. 2801, 110th Cong. § 4 (2007). Congress rejected such proposals.

77.     Ultimately, Congress enacted legislation allowing the Secretary to decide whether to exchange Refuge lands and only allowed the Secretary to do so if it would be in the public interest. That legislation was included in a national lands bill enacted in 2009. Omnibus Public Lands Management Act (OPLMA), Pub. L. No. 111-11, § 6402, 123 Stat. 991, 1178–79 (2009).

78.     In OPLMA, Congress directed the Secretary to comply with NEPA and determine "whether to carry out the land exchange" in Izembek. *Id.* § 6402(b)(1).

79.     Under OPLMA, road use was required to be limited to primarily health and safety purposes and only noncommercial purposes. *Id.* § 6403(a)(1)(A).

80.     For the land exchange considered under OPLMA, KCC offered 13,300 acres of its land and the State of Alaska offered to exchange 43,093 acres of its lands to the federal government. 2013 ROD at 14. In exchange, slightly more than 200 acres within Izembek would have been exchanged out of federal ownership. *Id.*

81.     The Service prepared an EIS to analyze the impacts of the proposed exchange under OPLMA, and to document the results of this extensive scientific and public process. *See* 2013 Final EIS.

_____
*Friends of Alaska National Wildlife Refuges, et al. v. Burgum, et al.*
Case No. 3:25-cv-00318
                                                                    Page 23 of 59

Case 3:25-cv-00318    Document 1    Filed 11/12/25    Page 23 of 59

82.     The 2013 Final EIS evaluated two potential road alignments, as well as two alternatives for providing marine transport between King Cove and Cold Bay via hovercraft or ferry. *See* 2013 Final EIS at 2-20 to 2-49. The environmental consequences for each of these transportation alternatives, as well as a No Action alternative, were considered for the various resources in Izembek. *Id.*

83.     After completion of the 2013 Final EIS, former Secretary Sally Jewell decided not to proceed with the land exchange. *See* 2013 ROD at 2–3.

84.     In her decision, Secretary Jewell described how a road would impact the wildlife and habitat of Izembek, including Pacific black brant, tundra swans, emperor geese, Steller's eiders, brown bear, caribou, and wolves. *Id.* at 7–8.

85.     Secretary Jewell concluded that the impacts of a road through Izembek would significantly and adversely affect the Refuge and "would not be offset" by adding the exchange lands to Izembek. *Id.* at 3; *see also id.* at 9 (noting that the lands offered would not likely be developed in a way that would have the same impacts as a road).

86.     Secretary Jewell explained that not moving forward with the land exchange "protects the unique resources the Department administers for the entire Nation." *Id.* at 20. By rejecting the land exchange, Secretary Jewell explained that the decision protected Izembek's "unique and internationally recognized habitats," maintained the integrity of designated Wilderness, and ensured that the Refuge would continue to meet the purposes

that it was originally established for in 1960 and re-designated to achieve in ANILCA. *Id.*; *see also id.* at 4.

87.     Secretary Jewell found that a land exchange would "diminish the ability of the Service to meet the objectives of the Wilderness Act" because the impacts to the remaining Wilderness in Izembek would be "irreparabl[e] and significant[]." *Id.* at 9.

88.     Secretary Jewell explained that Izembek's wetlands are designated as a Wetland of International Importance under the Ramsar Convention, which the U.S. is "obligated to protect pursuant to treaties." *Id.* at 5.

89.     Secretary Jewell found that a road would lead to increased "human access and activity" that would have "profound adverse effects on wildlife use and habitats of the narrow isthmus." *Id.* at 4; *see also id.* at 9 (noting that damage from off-road use cannot be prevented through regulation, enforcement, or barriers).

90.     Secretary Jewell also found that travel times for other forms of transportation (air, hovercraft, and ferry options) could be similar to, or at times quicker than, a road. 2013 ROD at 10–11.

91.     Secretary Jewell ultimately found that not proceeding with the land exchange "best satisfies Refuge purposes, and best accomplishes the mission of the Service and the goals of Congress in ANILCA." *Id.* at 20.

92.     KCC, along with the Agdaagux Tribe of King Cove, the Native Village of Belkofski, KCC, the Aleutians East Borough, the City of King Cove, and two individuals,

---

*Friends of Alaska National Wildlife Refuges, et al. v. Burgum, et al.*
Case No. 3:25-cv-00318

challenged former Secretary Jewell's decision in federal court. Compl. for Declaratory and Injunctive Relief, *Agdaagux Tribe of King Cove v. Jewell*, 128 F. Supp. 3d 1176 (D. Alaska 2015), ECF No. 1, (No. 3:18-cv-00110-HRH). The State of Alaska joined that litigation as an intervenor-plaintiff. Order Granting State of Alaska's Motion to Intervene, *Agdaagux Tribe of King Cove v. Jewell*, 128 F. Supp. 3d 1176 (D. Alaska 2015) (No. 3:18-cv-00110-HRH), ECF No. 11. Friends of Alaska National Wildlife Refuges, Defenders of Wildlife, the Center for Biological Diversity, the Wilderness Society, National Audubon Society, the National Wildlife Refuge Association, the Sierra Club, and Wilderness Watch joined as intervenor-defendants. Order Granting Friends of Alaska National Wildlife Refuges et al.'s Mot. to Intervene, *Agdaagux Tribe of King Cove v. Jewell*, 128 F. Supp. 3d 1176 (D. Alaska 2015) (No. 3:18-cv-00110-HRH), ECF No. 37.

93.     In September 2015, the U.S. District Court for the District of Alaska upheld Secretary Jewell's decision to not move forward with a land exchange and road construction. *Agdaagux Tribe of King Cove v. Jewell*, 128 F. Supp. 3d 1176 (D. Alaska 2015). The plaintiffs and the State of Alaska appealed that decision to the U.S. Court of Appeals for the Ninth Circuit, but later voluntarily dismissed the case.

94.     In May 2017, KCC wrote to former Secretary Zinke asking him to exchange land under the Alaska Native Claims Settlement Act (ANCSA) and ANILCA "that would allow King Cove to complete a road connection between King Cove and

Cold Bay, Alaska." Letter from Dean Gould, President, King Cove Corp., to Hon. Ryan Zinke, Sec'y of the Interior (May 24, 2017).

95.     In January 2018, Secretary Zinke signed an "Agreement for the Exchange of Lands" with KCC. Agreement for the Exchange of Lands Between King Cove Corporation and the United States (Jan. 22, 2018) [hereinafter 2018 Exchange Agreement].

96.     The 2018 Exchange Agreement stated that "the United States will convey to KCC the surface and subsurface estate of up to 500 acres from within [the Refuge] that are identified by KCC as being needed for the construction, operation, and maintenance of a road linking King Cove with the Cold Bay airport (the U.S. Exchange Lands)." *Id.* at 1.

97.     In return, KCC was to convey to the United States the surface estate of certain lands it owns in the Izembek and Alaska Peninsula national wildlife refuges. *Id.* at 2–3.

98.     The 2018 Exchange Agreement imposed some use restrictions the proposed road, including a requirement that the road would be used primarily for health and safety purposes, and generally prohibiting commercial use of the road. *Id.* at 3. These prohibitions were required to be included in any patent issued by the Secretary to ensure that the Izembek lands would remain subject to the laws and regulations governing use and development in the Izembek Refuge. *See* 43 U.S.C. § 1621(g).

_____

*Friends of Alaska National Wildlife Refuges, et al. v. Burgum, et al.*
Case No. 3:25-cv-00318

99.     Friends of Alaska National Wildlife Refuges, the Wilderness Society,

National Audubon Society, Wilderness Watch, the Center for Biological Diversity,

Defenders of Wildlife, the National Wildlife Refuge Association, Alaska Wilderness

League, and the Sierra Club brought a lawsuit in federal district court challenging the

2018 Exchange Agreement. Compl. for Declaratory and Injunctive Relief, *Friends of

Alaska Nat'l Wildlife Refuges v. Bernhardt*, 381 F. Supp. 3d 1127 (D. Alaska 2019) (No.

3:18-cv-00029-TMB), ECF No. 1. KCC and other road proponents intervened as

defendants. Order Granting Consent Mot. to Intervene, *Friends of Alaska Nat'l Wildlife

Refuges v. Bernhardt*, 381 F. Supp. 3d 1127 (D. Alaska 2019) (No. 3:18-cv-00029-

TMB), ECF No. 36.

100.    While the case was pending and pursuant to the 2018 Exchange Agreement,

BLM conducted a cadastral survey, aided by a helicopter, of the potential road corridor

within the Izembek Wilderness in July 2018. *See* Mitch Ellis, Alaska Regional Chief,

Nat'l Wildlife Refuge System, U.S. Fish and Wildlife Serv., Izembek National Wildlife

Refuge / King Cove Corporation Land Exchange Agreement — Cadastral Survey and

Analysis of Effects to Wilderness Characteristics 2 (July 12, 2018).

101.    In March 2019, BLM filed the cadastral survey, U.S. Survey No. 14495,

despite protests that BLM did not perform its survey in compliance with legal mandates

and the agency's own policies and procedures set forth in the BLM Manual of Survey

Instructions (2009), rendering the survey invalid. *See* Filing of Plats of Survey: Alaska,

Case 3:25-cv-00318     Document 1     Filed 11/12/25     Page 28 of 59

83 Fed. Reg. 46188 (Sept. 12, 2018); BLM, Filing of Plats of Survey: Alaska, 83 Fed. Reg. 50956 (Oct. 10, 2018) (correction).

102.    In March 2019, the District Court granted summary judgment to the plaintiffs, holding that the 2018 Exchange Agreement violated the APA because Interior had failed to justify the change in policy from the prior administration. *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 381 F. Supp. 3d 1127, 1141–43 (D. Alaska 2019).

103.    The District Court held that the 2018 Exchange Agreement did not contain an acknowledgment of the Secretary's fundamental change in agency policy from its 2013 ROD. *Id.* at 1140. Specifically, the 2018 Exchange Agreement provided no reasoned explanation regarding its departure from the 2013 ROD's findings concerning a road's harmful environmental impacts on the Izembek Refuge and prior determinations that viable alternatives to a road exist. *Id.* at 1140–41.

104.    The Court concluded that the Secretary's decision to enter into the 2018 Exchange Agreement constituted an unlawful agency action and was arbitrary and capricious under the APA. *Id.* at 1143.

105.    Specifically, the Court determined that "the Secretary's failure to acknowledge the change in agency policy and his failure to provide a reasoned explanation for that change in policy are serious errors." *Id.*

---

*Friends of Alaska National Wildlife Refuges, et al. v. Burgum, et al.*
Case No. 3:25-cv-00318

106. The Court entered Judgment and set aside and vacated the 2018 Exchange Agreement. J. in a Civil Case, *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 381 F. Supp. 3d 1127 (D. Alaska 2019) (No. 3:18-cv-00029-SLG), ECF No. 83.

107. In May 2019, Defendants in the *Friends* case appealed the decision to the Ninth Circuit. Notice of Appeal, *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, (No. 19-35452), 2019 U.S. App. LEXIS 26297 (9th Cir. July 22, 2019), ECF No. 1-1.

108. Also in May 2019, KCC wrote to former Secretary Bernhardt asking him to consider another land exchange that allows for a "transportation system between the City of King Cove and the Cold Bay airport." Letter from Dean Gould, KCC President, to David Bernhardt, Sec'y of the Interior 1 (May 21, 2019).

109. In July 2019, Secretary Bernhardt and KCC signed a new Exchange Agreement. Agreement for the Exchange of Lands Between King Cove Corporation and the United States (July 12, 2019) [hereinafter 2019 Exchange Agreement].

110. Also in July 2019, the Secretary moved to dismiss the appeal of the 2018 Exchange Agreement. Unopposed Mot. for Voluntary Dismissal, *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, (No. 19-35452), 2019 U.S. App. LEXIS 26297 (9th Cir. July 22, 2019), ECF No. 10. The Ninth Circuit granted the motion. *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, No. 19-35452, 2019 U.S. App. LEXIS 26297 (9th Cir. July 22, 2019).

111.    The 2019 Exchange Agreement states that the United States "intends to convey to KCC the surface and subsurface estate of the lands delineated in U.S. Survey No. 14495, Alaska, that have been previously identified by KCC as being needed for the construction, operation, and maintenance of a road linking King Cove with the Cold Bay airport (U.S. Exchange Lands)." 2019 Exchange Agreement at 1.

112.    The 2019 Exchange Agreement did not include a provision limiting use of the proposed road for health and safety purposes nor impose any restrictions on commercial use of the road.

113.    The 2019 Exchange Agreement was accompanied by a memorandum from the Secretary, which described the legal background for the exchange, including ANILCA, ANCSA, NEPA, and the ESA. David Bernhardt, Sec'y of the Interior, Findings and Conclusions Concerning a Proposed Land Exchange Between the Secretary of the Interior and King Cove Corporation for Lands Within Izembek National Wildlife Refuge, Alaska 12–16 (July 3, 2019) [hereinafter Bernhardt Memo].

114.    The Secretary claimed that the exchange would serve the purposes of ANILCA and ANCSA by balancing "the national interest in the scenic, natural, cultural, and environmental values of the public lands in Alaska and providing an adequate opportunity for satisfaction of the economic and social needs of the Alaska Native people of King Cove." *Id.* at 19.

---

*Friends of Alaska National Wildlife Refuges, et al. v. Burgum, et al.*
Case No. 3:25-cv-00318

115.    The Bernhardt Memo did not provide detailed findings on ANILCA purposes for Izembek, the Range purposes, or the Wilderness Act or National Wildlife Refuge System Act purposes, and the Secretary did not ensure that the Exchange Agreement met the requirements for an exchange under ANILCA Section 1302(h), 16 U.S.C. § 3192(h). *See id.* at 1–20.

116.    Prior to executing the Exchange Agreement, the Secretary did not comply with the requirements of ANILCA Title XI, NEPA, or ESA Section 7.

117.    Friends of Alaska National Wildlife Refuges, the Wilderness Society, National Audubon Society, Wilderness Watch, the Center for Biological Diversity, Defenders of Wildlife, the National Wildlife Refuge Association, Alaska Wilderness League, and the Sierra Club brought a lawsuit challenging the 2019 Exchange Agreement in August 2019. *See Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt* (*Friends II*), 463 F. Supp. 3d 1011 (D. Alaska 2020). KCC and the State of Alaska intervened as defendants. *Id.* at 1015.

118.    The District Court held the Secretary's decision to enter into the 2019 Exchange Agreement constituted an unlawful agency action and was "arbitrary and capricious under the APA because the Secretary failed to provide adequate reasoning to support the change in policy in favor of a land exchange and a road through Izembek." *Id.* at 1022.

119.    The District Court also found that "a road through Izembek and its isthmus would cause significant ecological damage, thereby defeating the [ANILCA] purposes." *Id.* at 1023.

120.    The District Court held that the 2019 Exchange Agreement "fails to advance the stated purposes of ANILCA, it is not permissible under that statute" and is "an unlawful action under the APA." *Id.* at 1024.

121.    The District Court held that the 2019 Exchange Agreement was an approval of a transportation system within a conservation system unit and required congressional approval under Title XI of ANILCA. *Id.* at 1026.

122.    The Court entered judgment and set aside and vacated the 2019 Exchange Agreement. J. in a Civil Case, *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 463 F. Supp. 3d 1011 (D. Alaska 2020) (No. 3:19-cv-00216-JWS), ECF No. 52.

123.    In August 2020, Defendants in *Friends II* appealed the decision to the Ninth Circuit.

124.    In March 2022, a three-judge Ninth Circuit panel reversed the District Court's decision. *Friends of Alaska Nat'l Wildlife Refuges v. Haaland*, 29 F.4th 432, 444 (9th Cir. 2022).

125.    Plaintiffs petitioned for en banc rehearing of the panel decision. The Ninth Circuit granted the petition and vacated the panel decision. *Friends of Alaska Nat'l Wildlife Refuges v. Haaland*, 54 F.4th 608, 609 (9th Cir. 2022).

126.    During the pendency of the Ninth Circuit's en banc review, former

Secretary Haaland withdrew Interior from the 2019 Exchange Agreement citing

"significant policy concerns regarding the manner in which the 2019 Land Exchange was

accomplished, as well as the terms of that exchange." Deb Haaland, Sec'y of the Interior,

Decision Memorandum to Withdraw from the 2019 Land Exchange Agreement Between

the Secretary of the Interior and King Cove Corporation 1 (Mar. 14, 2023) [hereinafter

Withdrawal Memo].

127.    Secretary Haaland found Interior had failed to consider the effects of the

2019 Land Exchange on subsistence uses. *Id.* at 2. Interior had also failed to conduct an

adequate NEPA and ESA analysis for the 2019 Land Exchange. *Id.* at 3. Secretary

Haaland underscored that the "complete lack of public participation and major

differences in the substance of the exchange evaluated in the 2019 Land Exchange

compared to the exchange evaluated in the 2013 EIS" also supported withdrawal of the

2019 Land Exchange. *Id.* at 1.

128.    Based on Secretary Haaland's withdrawal from the 2019 Exchange

Agreement, Interior moved to dismiss the appeal pending en banc review. *Friends of

Alaska Nat'l Wildlife Refuges v. Haaland*, No. 20-35728, 2023 U.S. App. LEXIS 14927,

at *4 (9th Cir. June 15, 2023). The Ninth Circuit granted Interior's motion. *Id.*

129.    On May 18, 2023, the Service published a Notice of Intent to Prepare a

Supplemental Environmental Impact Statement (SEIS) for a Potential Land Exchange

_____

*Friends of Alaska National Wildlife Refuges, et al. v. Burgum, et al.*
Case No. 3:25-cv-00318

Involving Izembek National Wildlife Refuge Lands, announcing the Service's plan to prepare a supplemental EIS "to address an exchange under section 1302(h) of ANILCA or under other authorities" and to "thoroughly assess[] the impacts of the potential exchange and road, allowing for public participation, and integrating the NEPA analysis with an evaluation under ANILCA section 810." Notice to Prepare a Supplemental Environmental Impact Statement for Potential Land Exchange Involving Izembek National Wildlife Refuge Lands, 88 Fed. Reg. 31813, 31814 (May 18, 2023).

130. Friends submitted scoping comments to the Service. Friends of Alaska Nat'l Wildlife Refuges et al., Comment Letter on Notice of Intent to Prepare a Supplemental EIS for Izembek Land Exchange (June 20, 2023). The comments outlined numerous legal, technical, and resource issues that the Service needed to consider before approving a land exchange for a road through Izembek. *Id.*

131. Friends commented that ANILCA section 1302(h) does not provide the Service the authority to execute a land exchange for a road through Izembek because ANILCA Title XI is the "single comprehensive statutory authority for the approval or disapproval of applications for [transportation and utility] systems" through conservation system units. *Id.* at 11.

132. Friends further commented that an exchange under ANILCA Section 1302(h) for a road does not further the purposes of ANILCA and Izembek, as required by that provision. *Id.* at 9–11. Friends requested the Service identify a valid authority for any

exchange, redefine the Statement of Purpose and Need, and develop a new range of reasonable alternatives to look beyond those evaluated in the 2013 EIS to broadly consider options to address emergency medical access in King Cove. *Id.* at 11–18.

133.    In November 2024, the Service released a draft Supplemental Environment Impact Statement (DSEIS) for a land exchange for a road through Izembek. U.S. FISH & WILDLIFE SERV., IZEMBEK NATIONAL WILDLIFE REFUGE LAND EXCHANGE/ROAD CORRIDOR DRAFT SUPPLEMENTAL ENVIRONMENTAL IMPACT STATEMENT (2024) [hereinafter DSEIS]. Comments on the DSEIS were due by December 30, 2024. Notice of Availability, 89 Fed. Reg. 90306 (Nov. 15, 2024).

134.    The DSEIS cited ANILCA Section 1302(h) as the authority for the proposed land exchange and stated "the purposes of the proposed action are to provide a safe, reliable, year-round transportation system for health and safety purposes, with particular emphasis on emergency medical evacuations, between King Cove and Cold Bay, Alaska, and increase the overall conservation value lands preserved in the National Wildlife Refuge System and maintain or increase the opportunity for subsistence uses by rural Alaskans." DSEIS at 1-8.

135.    The DSEIS considered a no-action alternative and five action alternatives — Alternatives 2, 3, 4, 5, and 6. *Id.* at 2-22 to 2-61. Alternative 6 was the only new alternative not previously considered in the 2013 EIS. *Id.* at 2-15. Alternative 6 evaluated the removal of 490 acres of Izembek Refuge lands, including 336 acres of Wilderness

lands, in exchange for 1,739 of KCC lands added to Wilderness and 29,459 acres added to the Alaska Peninsula Wildlife Refuge (surface estate only). *Id.* at 2-26 to 2-27, 2-64. The action alternatives also considered two marine transportation alternatives — Alternatives 4 and 5. *Id.* at 2-26.

136. The DSEIS identified Alternative 6 as the Service's preferred alternative. *Id.* at ES–4.

137. The DSEIS confirmed longstanding agency findings that the proposed road would harm Izembek's fish and wildlife populations and habitats by fragmenting and degrading the integrity of the lagoon complex. *Id.* at 4-222 to 4-223. Waterfowl and mammals use the lagoons, isthmus wetlands, tundra, and tidal flats to nest, feed, transit, and forage and will be harmed by the proposed road. *Id.*

138. The DSEIS acknowledged that the construction of a road through the isthmus between Izembek and Kinzarof Lagoons and the resulting increased use of the area, particularly access by all-terrain vehicles, makes Izembek's ANILCA purpose to fulfill international treaty obligations "more difficult for the Service than under the current situation." *Id.* at 4-224. The DSEIS admitted these harms may be so impactful to warrant "reconsideration of the designation of the area as a Wetland of International Importance." *Id.*

139. The DSEIS concluded that the proposed road "may result in a significant restriction to subsistence uses for the communities of King Cove, Cold Bay, False Pass,

Nelson Lagoon, and Sand Point." DEIS app. D-2 at 49. The DSEIS also recognized that population-level changes in waterfowl species may have cumulative impacts on other communities, such as those in the Yukon-Kuskokwim Delta, where "one-third of Hooper Bay households use Pacific black brant and nearly one-quarter of households use emperor geese." *Id.* at 50.

140.    The DSEIS stated the construction, maintenance and operation of a road through the Izembek Refuge, although increasing access for local residents, would, overall, negatively impact subsistence resources and availability. *Id.* at 39–40. For example, construction, maintenance and operation of a road corridor may "negatively affect caribou migration, distribution, and behavior, thus reducing and significantly impacting the availability of this resource to local users" and may change waterfowl behavior and migration patterns, resulting in poorer body condition and higher mortality rates. *Id.* at 38.

141.    The DSEIS stated that adverse impacts to water quality from the proposed road corridor to waters flowing into the Kinzarof lagoon would be intense and permanent. DSEIS at 4-507.

142.    As to Wilderness, the DSEIS concluded that the proposed exchange would make it "considerably more difficult for the Service to manage the Izembek Wilderness to meet the wilderness purpose of the Izembek National Wildlife Refuge." *Id.* at 4-225 to 26. The DSEIS detailed that a road through Izembek threatens its ecologically sensitive

habitat and would fragment and degrade the integrity of its foundational wetlands ecosystem. *Id.* at 4-222 to 4-223, 4-569.

143.    Friends submitted comments on the DSEIS to the Service. Friends of Alaska Nat'l Wildlife Refuges et al., Comment Letter on Draft Supplemental EIS for Izembek Land Exchange (February 13, 2025).  Friends again criticized the Service for failing to follow the only valid procedure to allow for a road through designated Wilderness lands in Alaska — the mandatory, detailed process set forth in ANILCA Title XI. *Id.* at 3.

144.    Friends further commented that, even in the alternative, if ANILCA Title XI was found not to apply, the Service still could not authorize the exchange under ANILCA Section 1302(h). *Id.* at 11. Friends explained that the plain language of ANILCA 1302(h) requires that any land exchange must further the conservation and subsistence purposes of ANILCA as well as the specific purposes of the Izembek Refuge and pointed out that, as assessed many times by the Service and again demonstrated in the DSEIS, a road through Wilderness does not further those purposes. *Id.* at 11–12.

145.    After the conclusion of the comment period, Friends anticipated that, in due course, the Service would issue a Final Supplemental EIS and a Record of Decision.

146.    Until August 2025, Friends had no reason to believe that the Service would not finalize the Supplemental EIS.

_____

*Friends of Alaska National Wildlife Refuges, et al. v. Burgum, et al.*
Case No. 3:25-cv-00318

147. On August 4, 2025, the Aleutians East Borough posted on its Facebook page an undated notice from the Service inviting the public to attend and testify at ANILCA Section 810 Hearings for a 2025 Proposed Land Exchange and Road Corridor.

148. Based on the preliminary ANILCA Section 810 analysis, it appeared the Service was abandoning the Supplemental EIS process. U.S. FISH & WILDLIFE SERV., DRAFT ANILCA SECTION 810 ANALYSIS OF SUBSISTENCE IMPACTS FOR THE PROPOSED ACTION FOR THE 2025 IZEMBEK LAND EXCHANGE AND ROAD CORRIDOR (July 2025) [hereinafter Draft Section 810 Analysis]. This is when Friends first learned that the Service was considering a new land exchange proposal.

149. On August 21, 2025, Friends submitted comments on the draft Section 810 analysis for the proposed 2025 Land Exchange and Road Corridor. Trs. for Alaska, Comment Letter on Draft ANILCA Section 810 Analysis for the Proposed 2025 Izembek Land Exchange (Aug. 21, 2025). Friends criticized the Service for failing to provide sufficient notice and opportunity to comment on the draft Section 810 analysis. *Id.* at 1–2. Friends also critiqued the Service for abandoning its current NEPA process, as there was no NEPA analysis noticed along with the draft Section 810 analysis. *Id.* at 3.

150. On October 21, 2025, Interior entered into an Exchange Agreement to trade away lands within Izembek's Wilderness for KCC-owned lands to allow for the construction of a road connecting the communities of King Cove and Cold Bay. 2025 Exchange Agreement.

151.    The Exchange Agreement states the United States will convey to KCC the

surface and subsurface estate of lands delineated in U.S. Survey No. 14495, Alaska, to

> provide a corridor for the construction and operation of a public road between
> King Cove and Cold Bay that will improve public health and safety and provide
> affordable transportation, enhancing access to goods and service, all of which
> would improve the quality of life for KCC shareholders, tribal members, other
> residents of King Cove, and the general public who will have a permanent
> connection to and from King Cove.

*Id.* at 4–5.

152.    The Exchange Agreement states that

> the exchange furthers the dual purposes Congress declared in ANILCA section
> 101(d) that it sought to strike a balance between: a) protecting the national interest
> in the scenic, natural, cultural, and environmental values of the public lands in
> Alaska and b) providing adequate opportunity for satisfaction of the economic
> and social needs of the State of Alaska and its people, including public health and
> safety, subsistence uses, and reliable transportation and utility systems.

*Id.* at 4.

The Exchange Agreement does not include any provisions limiting the use of the road for

health and safety purposes nor impose any restrictions on commercial use. *Id.* at 1–12.

153.    The Exchange Agreement states that the United States will pay to equalize

the value of lands conveyed by KCC to the United States "[b]ecause the value of the U.S.

Exchange Lands is less than the value of the KCC Exchange Lands." *Id.* at 6.

154.    The Exchange Agreement states that the land exchange does not count

against KCC's ANCSA entitlement. *Id.* at 5.

155.    Under the Exchange Agreement, KCC would relinquish its selection rights

under ANCSA to 5,430 acres located within Izembek. *Id.* at 6. KCC will be entitled to the

conveyance of 5,430 acres previously selected, but not yet conveyed, under ANCSA outside of Izembek. *Id.*

156.    The Exchange Agreement was accompanied by a document, entitled Decision of the Secretary, which purports to explain the Secretary's decision to execute the Exchange Agreement. U.S. DEP'T OF THE INTERIOR, U.S. FISH & WILDLIFE SERV., DECISION OF THE SECRETARY: CONCERNING A PROPOSED LAND EXCHANGE BETWEEN THE SECRETARY OF THE INTERIOR AND KING COVE CORPORATION INVOLVING LANDS WITHIN IZEMBEK NATIONAL WILDLIFE REFUGE, ALASKA (Oct. 2025) [hereinafter Decision].

157.    The Decision explains that the purpose of the Exchange Agreement is

> for the United States to acquire land interests within the Izembek National Wildlife Refuge (Izembek Refuge) from KCC that further the purposes of the Alaska National Interest Lands Conservation Act (ANILCA) in exchange for providing KCC with lands that would allow KCC to pursue the construction and operation of a long-term, safe, reliable, and affordable year-round road from King Cove to the airport in Cold Bay.

*Id.* at 1.

158.    The Decision states the authority for the Exchange Agreement is Section 1302(h) of ANILCA. *Id.*

159.    The Decision provides a summary of the factual background for the Exchange Agreement, including the history of the Izembek Refuge, the communities of King Cove and Cold Bay, a short description of Izembek's conservation value, and a

partial history and description of exchange related actions, including the 2013 ROD and 2024 DSEIS. *Id.* at 1–10.

160. Although the Decision states "it is important to note that the Proposed Land Exchange would not authorize any ground-disturbing activities, and road construction," the Decision provides details and specifications for construction of the proposed road. *Id.* at 13. The proposed public road would be 18.9 miles, mostly within the Izembek Refuge, and include 113 turnouts and 13 material sites (i.e., gravel mines), 12 of which would be in Wilderness. *Id.* at 13–14, 16. Construction would also include "1 bridge over a large stream near Milepoint 2.6, 7 culverts/pipe arches or small bridges to cross small streams, and 63 cross drainage culverts to maintain natural drainage patterns." *Id.* at 14.

161. The Decision acknowledges that the impacts from the proposed road will be greater than the impacts associated with Alternative 6 in the 2024 DSEIS because the Exchange Agreement "does not restrict the use of the road to non-commercial purposes." *Id.* at 26.

162. The Decision purports to find that certain design features may minimize impacts of the proposed road including a non-mandatory 0.5 mile buffer between the proposed road and Kinzarof and Izembek lagoons, placement of road alignment to avoid snow drift, and placement to the extent "practicable" in alignment with "existing roads, jeep trails, and disturbed areas." *Id.* at 20. The Decision does not provide support or analysis for its conclusion that these measures will minimize impacts from the proposed

_____

*Friends of Alaska National Wildlife Refuges, et al. v. Burgum, et al.*
Case No. 3:25-cv-00318

Page 43 of 59

road to the Izembek Refuge or identify how these measures would minimize the impacts found in the 2024 DSEIS.

163.    The Decision states the Secretary considered the following factors in entering the Exchange Agreement: (1) "2013 EIS and 2013 ROD of Secretary Jewell;" (2) "Secretary Zinke's decision to enter a land exchange agreement in 2018;" (3) "Secretary Bernardt's rationale and decision to enter a land exchange agreement in 2019;" (4) "Secretary Haaland's decision to withdraw from the 2019 Land Exchange Agreement and initiate an SEIS to evaluate a new proposed land exchange;" (5) "2024 Draft SEIS, 2024 preliminary ANILCA Section 810 analysis, testimony, and written materials on the 2024 Draft SEIS and 2024 preliminary ANILCA Section 810 analysis;" (6) "2025 Preliminary ANILCA Section 810 analysis, testimony, and written materials on the 2025 preliminary ANILCA Section 810 analysis, the final ANILCA Section 810 analysis;" (7) the Service's 2025 Biological Opinion, National Marine Fisheries Service's (NMFS) Letter of Concurrence, and NMFS essential fish habitat consultation. *Id.* at 23.

164.    The Decision rejects former Secretary Haaland's reliance on the subsistence and conservation purposes found in ANILCA Section 101(b) and 101(c) as the requisite purposes for a land exchange pursuant to Section 1302(h) of ANILCA. *Id.* at 24–25. Instead, the Decision asserts that ANILCA Section 101(d) sets forth the requisite purposes for a land exchange. *Id.* The Decision asserts that, pursuant to Section 101(d), ANILCA promotes a "balance" of "sufficient protection for the national interest in the

scenic, natural, cultural and environmental values on the public lands in Alaska, and at the same time [] adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people." *Id.* (quoting *Sturgeon v. Frost*, 587 U.S. 28, 36 (2019)).

165.    As to conservation values, the Decision states that "[t]he 2024 Draft SEIS did not analyze whether there would be any conservation benefits from the addition of approximately 1,739 acres of surface lands to the Izembek Refuge and Izembek Wilderness or of KCC's relinquishment of right to an additional 5,430 acres." *Id.* at 26. The Decision determines that there will be important conservation value in the addition of these KCC-owned lands to the Izembek Refuge, even though the lands are currently subject to the same protections as Refuge and Wilderness lands pursuant to Section 22(g) of ANCSA. *Id.* at 26–27. The Decision does not provide support or analysis for its conclusion beyond the speculative threat of future conveyance of these lands by KCC to private parties. *Id.*

166.    In addition, the Decision notes the Izembek Refuge possesses "a significant history of use of these lands for motorized transportation." *Id.* at 26. Thus, the Decision disagrees with the 2013 ROD portrayal of the proposed road corridor as "pristine and untrammeled." *Id.* The Decision does not explain or provide support for its conclusion that the presence of historical motorized transport — also acknowledged in the 2013 ROD — would warrant a change in agency decision-making. *See* 2013 ROD at 9.

167.     The Decision also disagrees with the 2013 ROD's assessment that a hovercraft transport system is a viable alternative for public health and safety access from King Cove to Cold Bay. *Id.* at 35–36. The Decision does not elaborate on how "the benefit of considering what has (or has not) transpired since the 2013 ROD" explains a change in agency decision-making from its previous assessment that hovercraft transportation was a viable alternative for medical access between these communities. *Id.* at 35 & n.36.

168.     The Decision disagrees with the DSEIS and draft 2025 Section 810 analysis finding that a proposed road "may significantly restrict subsistence uses." The Decision finds "at most, marginal support for the finding that the Proposed Land Exchange" may significantly restrict subsistence uses for King Cove, Cold Bay, Nelson's Lagoon, False Pass, and Sand Point. *Id.* at 45. Furthermore, "the cumulative case of the Proposed Land Exchange, to the extent the cumulative case is even required, would not significantly restrict subsistence use." *Id.* The Decision does not explain or provide support for its conclusion for this change in agency decision-making beyond the statement that the Secretary, "disagree[s] with the assumptions about the past, present, and reasonably foreseeable future actions that supported the determination." *Id.* The Decision notes that the DSEIS did not consider beneficial impacts to subsistence resources as a result of additional acres conveyed to or retained by the U.S., but it does not provide any further analysis of these benefits or their impact on subsistence resources. *Id.*

169.     The Decision acknowledges that "there will be some additional impacts on the wilderness character of the adjoining areas [to the proposed road] that remain wilderness." *Id.* at 51. Without further support or analysis, the Decision concludes "those impacts will be limited because any road will be constrained to a single-lane gravel road and associated material sites are largely associated only with the construction of the road." *Id.*

170.     The Secretary acknowledges that this Decision is a change in policy position from the no action alternative selected in the 2013 ROD. *Id.* at 36. The Secretary states that this change in position is warranted based on the medical needs of King Cove residents. *Id.* at 36. In support of this Decision, the Secretary also cites: (1) the acute necessity for a road to connect King Cove to Cold Bay for medical needs; (2) "[c]hanged information concerning the viability" of alternative means of transportation; (3) "[t]he failure in 2013 to take into" account the cost to taxpayers from emergency evacuations from King Cove by the U.S. Coast Guard, and (5) "even if the facts are as stated in the 2013 ROD," human life and safety are paramount, and the proposed land exchange is consistent with the public interest and the purposes of ANCSA and ANILCA. *Id.* at 36.

171.     On October 22, 2025, BLM issued a Patent transferring 489.96 acres of surface and subsurface estate from the United States to KCC. Patent at 1.

172. On October 22, 2025, KCC also issued a Warranty Deed for 1,737.24 acres to the United States for and in consideration of $48,050, and this was accepted by the Service on the same day. Warranty Deed.

173. The Exchange Agreement, Decision, Patent, Warranty Deed acceptance, and other implementing actions are final agency actions.

174. The Secretary did not ensure that the Exchange Agreement, Decision, Patent, Warranty Deed acceptance, and other implementing actions met the requirements for an exchange under ANILCA Section 1302(h), 16 U.S.C. § 3192(h).

175. Federal Defendants did not comply with procedures of ANILCA Title XI prior to executing the Exchange Agreement and finalizing the Decision, Patent, Warranty Deed acceptance, and other implementing actions. *See* Decision at 51.

176. The Secretary did not comply with the procedures mandated by NEPA prior to executing the Exchange Agreement and finalizing the Decision, Patent, Warranty Deed acceptance, and other implementing actions. *See id.* at 39–40.

177. The Secretary did not provide a detailed explanation for Interior's reversal of position from prior Secretarial and agency decisions rejecting similar exchanges. *See id.* at 23–50.

## FIRST CLAIM FOR RELIEF

(Violation of Alaska National Interest Lands Conservation Act, 16 U.S.C. §§ 3161–73)

178. Friends re-allege, as if fully set forth here, every allegation contained in paragraphs 1-177.

179.    Title XI of ANILCA requires that transportation systems through conservation system units in Alaska be approved or disapproved through its "single comprehensive statutory authority." 16 U.S.C. § 3161(c).

180.    Title XI of ANILCA mandates the use of specific forms, preparation of an EIS, compliance with specific timelines and public involvement, and that each agency with any permitting authority over a transportation system make eight detailed findings. 16 U.S.C. § 3164.

181.    Title XI of ANILCA prohibits the authorization of transportation systems through designated Wilderness without recommendation by the President and approval by Congress. 16 U.S.C. § 3166(b).

182.    KCC specifically seeks a land exchange to allow for a road between the City of King Cove and the Cold Bay airport.

183.    The Exchange Agreement specifically states that it is for the purpose of allowing the construction of a road.

184.    The Exchange Agreement was not adopted pursuant to Title XI's procedures.

185.    BLM issued the Patent from the United States to KCC in violation of Title XI procedures. *See* Patent.

186.    Service accepted the Warranty Deed issued from KCC to the United States in violation of Title XI procedures. *See* Warranty Deed.

187.   The President has not recommended to Congress that a road be constructed through Izembek pursuant to Title XI's procedures.

188.   Congress has not approved a road through Izembek pursuant to Title XI's procedures.

189.   The Secretary's decision to exchange Izembek lands for KCC lands for the purpose of allowing the construction of a road through the Refuge without complying with Title XI of ANILCA is "arbitrary, capricious, an abuse of discretion, . . . otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706.

190.   Because Title XI mandates that "no action by any Federal agency under applicable law with respect to the approval or disapproval of the authorization, in whole or in part, of any transportation or utility system shall have any force or effect unless the provisions of this section are complied with," the Exchange Agreement, Decision, Patent, Warranty Deed acceptance, and other implementing actions are null and void. 16 U.S.C. § 3164(a).

191.   The Exchange Agreement, Decision, Patent, Warranty Deed acceptance, and other implementing actions are "final agency actions for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

## SECOND CLAIM FOR RELIEF

(Violation of Alaska National Interest Lands Conservation Act, 16 U.S.C. § 3192)

192.　Friends re-allege, as if fully set forth here, every allegation contained in paragraphs 1-191.

193.　ANILCA Section 1302(h) mandates that the Secretary is authorized to acquire lands for the purposes of the Act via exchange. 16 U.S.C. § 3192(h).

194.　To execute an exchange under ANILCA section 1302(h), the Secretary must find that the land is being acquired for ANILCA's general purposes, Izembek's specific purposes including Wilderness, as well as the purposes of the Range. 16 U.S.C. § 3192(h).

195.　The primary purpose of the exchange is to divest lands from Izembek for a road, not to acquire lands for conservation and subsistence.

196.　The exchange also does not further the purposes of ANILCA.

197.　The Secretary's decision to divest Izembek lands for KCC lands for a road does not further the purposes of ANILCA and is "arbitrary, capricious, an abuse of discretion, . . . otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706.

198.　As a result of the Secretary's failure to comply ANILCA Section 1302(h), the Exchange Agreement, Decision, Patent, Warranty Deed acceptance, and other implementing actions are unlawful and should be vacated.

_____

*Friends of Alaska National Wildlife Refuges, et al. v. Burgum, et al.*
Case No. 3:25-cv-00318

199.    The Exchange Agreement, Decision, Patent, Warranty Deed acceptance, and other implementing actions are "final agency actions for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

### THIRD CLAIM FOR RELIEF

(Violation of Alaska National Interest Lands Conservation Act, 16 U.S.C. § 3192 and Administrative Procedure Act, 5 U.S.C. §§ 704–706)

200.    Friends re-allege, as if fully set forth here, every allegation contained in paragraphs 1-199.

201.    ANILCA mandates that acquiring lands be for the purposes of the Act. 16 U.S.C. § 3192(h).

202.    Prior Secretaries and the Service have repeatedly declined to exchange lands in Izembek, finding that doing so would not further the purposes of ANILCA, Izembek, the Wilderness Act, or the National Wildlife Refuge System, and would cause serious harm to Refuge resources, among other reasons.

203.    Contrary to these prior findings, Secretary Burgum determined that the Exchange Agreement would meet the purposes of ANILCA. Decision at 23–50.

204.    When an agency changes policy or course, it must "supply a reasoned analysis for the change." *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). More specifically, it must acknowledge the change in course, show that the new rule is permissible under the statute, express that it is a better policy, and provide good reasons for the change in policy. *F.C.C. v. Fox*

---

*Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009). When reversing a policy, an agency may not simply discard prior factual findings without reasoned explanation. Instead, when a policy change rests on new factual findings that contradict prior findings and circumstances, the agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate." *Id.*

205.    The Secretary failed to show that executing a land exchange for purposes of building a road through Wilderness in Alaska without complying with Title XI of ANILCA is permissible.

206.    The Secretary failed to show that a land exchange is permissible under the statute because the exchange does not further the purposes of ANILCA.

207.    In executing the Exchange Agreement, the Secretary failed to adequately explain the change in Interior's and the Service's long-held position to reject a land exchange in Izembek and confront multiple prior decisions finding that a land exchange would not meet ANILCA's purposes for multiple reasons, which may include, but are not limited to:

      a.  Failure to address the fact that the Exchange Agreement does not impose restrictions on the road to limit use to health, safety, medical, or generally noncommercial uses and consider or explain his conclusions in light of this fact;

b.  Failure to address the prior findings regarding the specific purposes of Izembek that would not be met by an exchange, including harm to fish and wildlife populations from habitat fragmentation and degradation, significant restrictions to subsistence use, impacts to water quality, and increased difficulties in protecting Izembek's Wilderness purposes and status as a Wetland of International Importance;

c.  Failure to acknowledge or consider the finding in the 1998 Land Protection Plan that a road is "the greatest known potential threat to wildlife and wilderness values within the Izembek Complex," Land Protection Plan at 53;

d.  Failure to acknowledge prior findings regarding the impacts of a land exchange and road on the purposes of the Wilderness Act and National Wildlife Refuge System Administration Act with respect to Izembek;

e.  Failure to address the fact that this Exchange Agreement results in more than twice the acreage being included in the road corridor than the 2013 proposed exchange, contains no barriers, and also includes gravel sites and failure to consider or explain his conclusions in light of this fact;

f.  Failure to address the fact that not more than 1,739 acres will be acquired by the United States, in contrast to the 2013 exchange in which over 13,000 acres of KCC lands and over 43,000 of State of Alaska lands would have been exchanged with the United States;

g. Failure to address the agency's prior finding that acquisition of KCC-selected lands did not support an exchange because those lands were unlikely to be developed in a manner that would have a similar impact to Izembek as a land exchange for a road;

h. Failure to consider the prior findings that a land exchange and road would lead to increased impacts on wildlife and habitat from human access and activity;

i. Failure to consider Izembek's designation under the Ramsar Convention and management obligations under that designation;

j. Failure to explain or justify his conclusion that the costs of Coast Guard medical evacuations were not accounted for in the 2013 ROD; and

k. Failure to explain or justify his conclusion that the acute necessity for a road was underestimated in 2013.

208. The Secretary's failure to demonstrate that the Exchange Agreement is permissible under ANILCA and to provide the required justification for the change in policy to support the 2025 Exchange Agreement renders the 2025 Exchange Agreement "arbitrary, capricious, an abuse of discretion, . . . otherwise not in accordance with law," or "without observance of the procedure required by law." 5 U.S.C. § 706.

209. As a result of the Secretary's failure to demonstrate that the Exchange Agreement is permissible and provide the required justification for the change in policy,

the Exchange Agreement, Decision, Patent, Warranty Deed acceptance, and other implementing actions are unlawful should be vacated.

210.    The Exchange Agreement, Decision, Patent, Warranty Deed acceptance, and other implementing actions are "final agency actions for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

## FOURTH CLAIM FOR RELIEF

(Violation of the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4336f)

211.    Friends re-allege, as if fully set forth here, every allegation contained in paragraphs 1-210.

212.    NEPA requires the preparation of an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

213.    The Exchange Agreement, Decision, Patent, Warranty Deed acceptance, and other implementing actions constitute major federal action significantly affecting the quality of the human environment.

214.    The Federal Defendants did not complete a NEPA analysis prior to Defendants' execution of the Exchange Agreement and finalizing of the Decision, Patent, Warranty Deed acceptance, and other implementing actions.

215.    The DSEIS did not consider an alternative that evaluated an exchange like the one set out in the Exchange Agreement and Decision.

216.    The Exchange Agreement states that "the Parties agree the land exchange under this Agreement will not result in any charge against KCC's ANCSA entitlement." 2025 Exchange Agreement at 5.

217.    ANILCA Section 910, 43 U.S.C. § 1638, does not apply to the Exchange Agreement and does not exempt Federal Defendants from compliance with NEPA.

218.    The Secretary's decision to exchange Izembek lands for KCC lands for the purpose of allowing the construction of a road through the Refuge without complying with NEPA is "arbitrary, capricious, an abuse of discretion, . . . otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706.

219.    BLM's issuance of the Patent, Service's acceptance of the Warranty Deed, and Federal Defendants' other implementing actions without complying with NEPA are "arbitrary, capricious, an abuse of discretion, . . . otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706.

220.    As a result of federal defendants' failure to comply with NEPA, the Exchange Agreement, Decision, Patent, Warranty Deed Acceptance, and other implementing actions are unlawful and should be vacated.

221.    The Exchange Agreement, Decision, Patent, Warranty Deed Acceptance, and other implementing actions are "final agency actions for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

---

## REQUEST FOR RELIEF

Plaintiffs request that the Court grant the following relief:

A.    Declare that the Exchange Agreement, Decision, Patent, Warranty Deed acceptance, and other implementing actions are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or without observance of procedure required by law, in violation of ANILCA, the APA, and NEPA;

B.    Invalidate, vacate, and set aside the Exchange Agreement, Decision, and any appraisals, patents, and warranty deeds authorized, executed, or issued to any party pursuant to the Exchange Agreement, including, but not limited to U.S. Patent No. 50-2026-0001 (Oct. 22, 2025) issued from the United States to KCC and the Warranty Deed, Record No. 2025-000209-0, Recording District: 305 – Aleutian Islands (Oct. 22, 2025), issued from KCC to the United States and accepted by the Service.

C.    Enter appropriate injunctive relief;

D.    Award Friends all reasonable costs and fees as authorized by law; and

E.    Award Friends such other and further relief as this Court deems just and proper.

Respectfully submitted this 12th day of November, 2025,

      s/ Siobhan McIntyre
Siobhan McIntyre (AK Bar No. 1206050)
Michelle Sinnott (AK Bar No. 1506049)
Brook Brisson (AK Bar No. 0905013)
TRUSTEES FOR ALASKA

---



*Attorneys for Plaintiffs*

---

*Friends of Alaska National Wildlife Refuges, et al. v. Burgum, et al.*
Case No. 3:25-cv-00318