**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| NATIVE VILLAGE OF HOOPER BAY, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DOUG BURGUM, *in his official capacity as Secretary of the U.S. Department of the Interior*, *et al.*,<br><br>Defendants,<br><br>v.<br><br>STATE OF ALASKA,<br><br>Intervenor-Defendant. | Case No. 3:25-cv-00316-SLG |
| FRIENDS OF ALASKA NATIONAL WILDLIFE REFUGES, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DOUG BURGUM, *in his official capacity as Secretary of the U.S. Department of the Interior*, *et al.*,<br><br>Defendants,<br><br>v.<br><br>STATE OF ALASKA,<br><br>Intervenor-Defendant. | Case No. 3:25-cv-00318-SLG |

| | |
|---|---|
| DEFENDERS OF WILDLIFE,<br><br>Plaintiff,<br><br>v.<br><br>DOUG BURGUM, *in his official capacity as Secretary of the U.S. Department of the Interior*, *et al.*,<br><br>Defendants,<br><br>v.<br><br>STATE OF ALASKA,<br><br>Intervenor-Defendant. | Case No. 3:25-cv-00319-SLG |

**DECISION AND ORDER**

The three above-captioned cases challenge the Agreement for the Exchange of Lands, dated October 21, 2025 (Land Exchange or Exchange), between the United States Fish and Wildlife Service (Service) of the Department of the Interior (the Department or Interior) and King Cove Corporation (KCC) transferring certain federal lands in the Izembek National Wildlife Refuge to KCC in exchange for certain KCC lands. Plaintiffs[1] bring suit against Federal

[1] In Case No. 3:25-cv-00316-SLG [hereinafter Case No. 316], Plaintiffs are Native Village of Hooper Bay, Native Village of Paimiut, Chevak Native Village, and Center for Biological Diversity. In Case No. 3:25-cv-00318-SLG [hereinafter Case No. 318], Plaintiffs are Friends of Alaska National Wildlife Refuges, Alaska Wilderness League, National Wildlife Refuge Association, Sierra Club, and Wilderness Watch. In Case No. 3:25-cv-00319-SLG [hereinafter Case No. 319], Plaintiff is Defenders of Wildlife.

Defendants and KCC.[2] Intervenor-Defendant the State of Alaska was permitted to intervene in all three cases.[3]

Plaintiffs moved for summary judgment seeking vacatur of the Secretary's decision approving the Exchange and the documents effectuating it.[4] KCC[5] and Federal Defendants[6] each responded in opposition. The State also responded in opposition and moved for summary judgment.[7] Plaintiffs replied.[8] Oral argument

---

[2] In Case No. 316 and Case No. 318, Federal Defendants are the U.S. Department of the Interior, Doug Burgum as Secretary of the Interior, the U.S. Bureau of Land Management (BLM), Kevin Pendergast as Alaska State Director of BLM, the U.S. Fish and Wildlife Service, and Sara Boario as Alaska Regional Director of the Service. In Case No. 319, Federal Defendants are Doug Burgum as Secretary of the Interior and Brian Nesvik as Director of the Service. KCC is also a Defendant in all three cases.

[3] Docket 15 (Case No. 316); Docket 16 (Case No. 318); Docket 22 (Case No. 319).

[4] Docket 16 (Case No. 316) [hereinafter Native Villages Opening] at 45-47; Docket 17 (Case No. 318) [hereinafter Friends Opening] at 45-48; Docket 23 (Case No. 319) [hereinafter Defenders Opening] at 58.

[5] Docket 20 (Case No. 316); Docket 21 (Case No. 318); Docket 28 (Case No. 319). KCC filed the same combined opposition brief in each of the three cases. Accordingly, the Court refers to those filings collectively as "KCC Resp." and will cite to Docket 20 (Case No. 316).

[6] Docket 22 (Case No. 316); Docket 23 (Case No. 318); Docket 30 (Case No. 319). Federal Defendants filed the same combined opposition brief in each of the three cases. Accordingly, the Court refers to those filings collectively as "Federal Defendants Resp."

[7] Docket 21 (Case No. 316); Docket 22 (Case No. 318); Docket 29 (Case No. 319). The State filed the same combined opposition brief in each of the three cases. Accordingly, the Court refers to those filings collectively as "State Resp." The Court notes that the State's case caption in Case No. 316 is one page longer than the captions in Case No. 318 and Case No. 319. The Court cites the docket page numbers from the filing in Case No. 316. Readers consulting the State's filings in the other two cases should add one page to the cited page number.

[8] *See* Docket 24 (Case No. 316) [hereinafter Native Villages Reply]; Docket 25 (Case No. 318) [hereinafter Friends Reply]; Docket 33 (Case No. 319) [hereinafter Defenders Reply].

was not requested by any party and was not necessary to the Court's determination.

## BACKGROUND

These cases are the latest in a series of lawsuits concerning efforts to build a road through the Izembek National Wildlife Refuge (Izembek Refuge or Refuge) to connect the community of King Cove with the all-weather airport in Cold Bay. The history of the proposed road and the Department of the Interior's repeated consideration of land exchanges intended to facilitate the road's construction has been detailed in prior litigation.[9]

King Cove and Cold Bay are located near the western end of the Alaska Peninsula. The two communities are approximately 18 miles apart and are separated by the Izembek Isthmus, which is a narrow corridor of land located between Izembek Lagoon and Kinzarof Lagoon; much of the isthmus is located within the Izembek Refuge.[10] Both communities are accessible only by sea or by air, but Cold Bay has an all-weather airport, while King Cove does not.[11] King

---

[9] *See Agdaagux Tribe of King Cove v. Jewell*, 128 F. Supp. 3d 1176 (D. Alaska 2015); *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 381 F. Supp. 3d 1127, 1131-35 (D. Alaska 2019) ; *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 463 F. Supp. 3d 1011, 1015-18 (D. Alaska 2020) [hereinafter *Friends of Alaska I*], *vacated as moot sub nom. Friends of Alaska Nat'l Wildlife Refuges v. Haaland*, Case Nos. 20-35721, 20-35727, 20-35728, 2023 WL 4066653 (9th Cir. June 15, 2023).

[10] LE_000008.

[11] LE_000008-09.

Cove and its related entities, including KCC, have long advocated for a road connecting the two communities, emphasizing the need for safe and reliable access to the Cold Bay airport and particularly for medical evacuations.[12]

Before Alaska became a state, the Izembek Isthmus was regularly traversed. In a 1935-1936 report, the Alaska Territorial Highway Commission documented the construction of three shelter cabins along the Izembek Isthmus.[13] Use of a road system across the isthmus continued into the 1950s: "If the distribution of fuel cans is a measure of how extensive vehicle use in the region was in the 1940s and 1950s, then vehicle use was indeed widespread."[14] Even now, a network of trails created by all-terrain vehicles weaves across portions of the isthmus.[15]

The Izembek Refuge is home to many wildlife species.[16] The Izembek and Kinzarof Lagoons also host multitudes of waterfowl annually, serving as a critical stopover for fueling long-distance migration.[17] Izembek Lagoon encompasses one

---

[12] LE_000009-16.

[13] LE_004793.

[14] LE_005412.

[15] LE_000020 (map depicting network of trails in pink from 2022 imagery mapping).

[16] LE_003920.

[17] LE_003137, LE_004264.

of the world's largest eelgrass beds, creating a feeding and nesting area for nearly the entire world's population of Pacific Black Brant.[18] The Refuge is also home to the world's only non-migratory population of tundra swans, rare and vulnerable emperor geese, and a significant percentage of the population of Steller's eiders, a threatened species under the Endangered Species Act (ESA).[19] Plaintiffs maintain that "[t]he planned road through Izembek will significantly and permanently degrade the wilderness character of Izembek's wilderness lands, both adjacent to the road and in interior wilderness areas."[20] They maintain that "[a] road would also increase access to Izembek Lagoon and therefore lead to an increase in hunting and disturbance of already-declining populations of black brant, emperor geese, and cackling geese."[21] In addition, Alaska-breeding "Steller's eiders, which cannot be legally hunted but may still be accidentally shot or hit by boats, would also face more frequent disturbances due to an increase in hunters at Izembek Lagoon after road construction."[22]

---

[18] LE_002938; LE_002942.

[19] LE_002942-43.

[20] Defenders Opening at 15 (citing LE_004349).

[21] Native Villages Opening at 13-14.

[22] Native Villages Opening at 13-14.

## I. Alaska National Interest Lands Conservation Act

Alaska joined the Union in 1959 pursuant to the Statehood Act of 1958.[23] But "[t]he Statehood Act did not . . . determine the rights of the Alaska Natives, who asserted aboriginal title to much of the same land now claimed by the State. In an effort to resolve this issue, Congress in 1971 passed the Alaska Native Claims Settlement Act (ANCSA), which extinguished aboriginal land claims in Alaska."[24] "[I]n ANCSA, Congress allowed Native Alaskans to select approximately 40 million acres of 'Federal lands and interests therein located in Alaska,' with the exception of federal installations and land selections of the State of Alaska under the Statehood Act."[25] ANCSA also directed the Secretary of the Interior to select up to 80 million acres of unreserved federal land in Alaska to add to the National Park, Forest, Wildlife Refuge, and Wild and Scenic Rivers Systems.[26] "When Congress failed to approve the Secretary's selections,

---

[23] Alaska Statehood Act, Pub. L. No. 85–508, 72 Stat. 339 (1958) (codified as a note preceding 48 U.S.C. § 21).

[24] *Sturgeon v. Frost*, 577 U.S. 424, 429 (2016) (citing 85 Stat. 688, as amended, 43 U.S.C. § 1601 *et seq.*).

[25] *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 552 (1987) (citing 43 U.S.C. §§ 1602(e), 1610(a), 1611).

[26] *Sturgeon*, 577 U.S. at 430.

however, President Carter unilaterally designated 56 million acres of federal land in Alaska as national monuments."[27]

> President Carter's actions were unpopular among many Alaskans, who were concerned that the new monuments would be subject to restrictive federal regulations . . . . Congress once again stepped in to settle the controversy, passing the Alaska National Interest Lands Conservation Act [(ANILCA) in 1980]. ANILCA had two stated goals: First, to provide "sufficient protection for the national interest in the scenic, natural, cultural and environmental values on the public lands in Alaska." And second, to provide "adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people."[28]

"ANILCA set aside 104 million acres of land in Alaska for preservation purposes, in the process creating ten new national parks, preserves, and monuments . . . and tripling the number of acres set aside in the United States for federal wilderness preservation."[29] "ANILCA's primary purpose was to complete the allocation of federal lands in the State of Alaska, a process begun with the Statehood Act in 1958 and continued in 1971 in ANCSA."[30]

Section 303(3) of ANILCA redesignated the existing Izembek National Wildlife Range as the Izembek National Wildlife Refuge, comprising approximately

---

[27] *Id.* (citing Presidential Proclamation Nos. 4611-4627, 3 C.F.R. §§ 69-104 (1978)).

[28] *Id.* at 430-31 (quoting 16 U.S.C. § 3101).

[29] *Id.* at 431 (citation omitted).

[30] *Amoco*, 480 U.S. at 550 & n.17 (holding that "Congress clearly articulated this purpose" in subsections (a) and (d) of 16 U.S.C. § 3101).

310,000 acres.[31] Section 702(6) of ANILCA designated approximately 300,000 acres of the Izembek Refuge as the Izembek Wilderness.[32] Congress established the Izembek Refuge for several purposes, including:

> (i) [to] conserve fish and wildlife populations and habitats in their natural diversity . . . ;
>
> (ii) to fulfill the international treaty obligations of the United States with respect to fish and wildlife and their habitats;
>
> (iii) to provide . . . the opportunity for continued subsistence uses by local residents; and
>
> (iv) to ensure, to the maximum extent practicable . . . water quality and necessary water quantity within the refuge.[33]

## II. 2025 Land Exchange

On January 20, 2025, the President issued Executive Order 14153, which in relevant part directed the Secretary of the Interior to "exercise all lawful authority and discretion available to him and take all necessary steps to . . . facilitate the expedited development of a road corridor between the community of King Cove and the all-weather airport located in Cold Bay."[34] On May 16, 2025, a group of

---

[31] Alaska National Interest Lands Conservation Act, Pub. L. No. 96-487, § 303(3)(A), 94 Stat. 2371, 2390 (1980) (codified at 16 U.S.C. § 3193(3)(A)).

[32] *Id.* § 702(6) (codified at 16 U.S.C. § 1132 note).

[33] *Id.* § 303(3)(B) (codified at 16 U.S.C. § 668dd note).

[34] *Unleashing Alaska's Extraordinary Resource Potential*, Exec. Order No. 14153 § 3(b)(xi), 90 Fed. Reg. 8347, 8348-49 (Jan. 20, 2025).

King Cove entities, including KCC, wrote to the Interior "express[ing] . . . [their] desire to move forward with a new proposed equal value land exchange agreement . . . [modeled] on the 2019 Land Exchange Agreement."[35]

In October 2025, Secretary of the Interior Doug Burgum issued a 56-page decision approving the Exchange between the United States and KCC (Decision)[36] and invoking Section 1302(h) of ANILCA as the sole authority for the Exchange.[37] Pursuant to the Exchange, the United States conveyed roughly 490 acres of federal land to KCC, including approximately 336 acres of designated wilderness.[38] In return, KCC conveyed approximately 1,739 acres near Kinzarof Lagoon to the United States and relinquished its selection rights to approximately 5,430 acres within the Refuge.[39] The United States also paid KCC $48,050 to equalize the value of the exchanged lands.[40]

---

[35] LE_005434 (KCC Proposal).

[36] The Secretary's Decision spans 56 pages with an additional cover page. LE_000001-57. Attached to the Decision are references and appendices totaling 122 pages. LE_000057-179.

[37] LE_000006 ("The authority for the proposed land exchange is Section 1302(h) of ANILCA." (citing 16 U.S.C. § 3192(h))).

[38] LE_000016; LE_000055.

[39] LE_000016 ("KCC will be entitled to identify alternative selected lands for conveyance that are located outside the Izembek Refuge."); *see also* LE_000017 ("2025 Proposed Land Exchange").

[40] LE_000393; *see* LE_000393-96 (Warranty Deed).

The federal lands conveyed to KCC include land on the Izembek Isthmus and form the corridor for a contemplated 18.9-mile single-lane gravel road between King Cove and Cold Bay.[41] Approximately 15.6 miles of the road corridor are lands conveyed to KCC in the Exchange that are located within the Izembek Refuge.[42] According to the Secretary, the Exchange will "allow KCC to pursue the construction and operation of a long-term, safe, reliable, and affordable year-round road from King Cove to the airport in Cold Bay."[43] The Exchange does not include any restrictions limiting the road to noncommercial traffic or otherwise constraining its use.[44]

In his Decision, the Secretary found that the Exchange "furthers the purposes of ANILCA" because

> it strikes the proper balance between protection of scenic, natural, cultural, and environmental values; provides opportunities for continued subsistence uses; and, more generally, for the long-term social and physical well-being of the State of Alaska and in particular the public health and safety and a broader set of economic and social needs of the Native and non-Native residents of King Cove.[45]

---

[41] LE_000018-19.

[42] LE_000018-19. Of this mileage, 5.1 miles is land within the Izembek Refuge where the road would be constructed on existing roads and trails.

[43] LE_000006.

[44] *See* LE_000031 ("[T]he Proposed Land Exchange does not restrict the use of the road to noncommercial purposes.").

[45] LE_000038.

The Secretary explained that he was departing from his predecessor's approach that had "omitted the economic and social needs of the State of Alaska and its people as a purpose of ANILCA . . . when evaluating an exchange under Section 1302(h)" because the requisite "balancing cannot fully ignore a foundational purpose of ANILCA."[46] The Secretary also noted Indigenous peoples in the area had used the lands and resources within the Izembek Refuge for centuries and the tribes, KCC, and the residents of King Cove "were not consulted during the creation of Izembek Refuge and its designation as wilderness."[47]

The Secretary's Decision and the Exchange Agreement contain extensive information about the design criteria for the road, details on the construction, operation, and maintenance of the road, and mitigation and conservation measures.[48]

---

[46] LE_000030.

[47] LE_000006; LE_000039.

[48] LE_000016-28; LE_000064-65. ("KCC has also committed to mitigation measures as part of the Final Proposed Action with Addendum for the proposed Izembek Land Exchange, dated October 14, 2025, for design, construction, operation, and maintenance of the road corridor; these measures are incorporated into this Agreement.").

In October 2025, Interior and KCC executed the Exchange Agreement.[49] BLM issued a patent conveying the federal exchange lands to KCC and KCC conveyed its exchange lands to the United States by warranty deed.[50]

### III. Procedural History

Plaintiffs subsequently filed these three actions challenging the Exchange under the Administrative Procedure Act (APA). Plaintiffs Native Village of Hooper Bay, Native Village of Paimiut, Chevak Native Village, and Center for Biological Diversity (collectively, Native Villages) assert violations of ANILCA and the ESA.[51] Plaintiffs Friends of Alaska National Wildlife Refuges, Alaska Wilderness League, National Wildlife Refuge Association, Sierra Club, and Wilderness Watch (collectively, Friends) assert violations of the APA, ANILCA, and the National Environmental Policy Act (NEPA).[52] Plaintiff Defenders of Wildlife (Defenders) asserts violations of ANILCA, the National Wildlife Refuge System Administration

---

[49] LE_000190.

[50] LE_000180 (Land Exchange Agreement); LE_000397-400 (Patent); LE_000393-96 (Warranty Deed).

[51] Docket 1 (Case No. 316).

[52] Docket 1 (Case No. 318).

Act (Refuge Act), and the Wilderness Act.[53] Plaintiffs and the State filed cross-motions for summary judgment, which are now before the Court.[54]

## JURISDICTION

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which "confer[s] jurisdiction on federal courts to review agency action, regardless of whether the APA of its own force may serve as a jurisdictional predicate."[55] Plaintiffs have demonstrated Article III standing because their citizens and their members face imminent concrete and particularized injuries that are fairly traceable to Defendants' actions and redressable by a favorable decision.[56] No Defendant argues otherwise.

## LEGAL STANDARD

Section 706 of the APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [or] in excess of statutory jurisdiction, authority, or limitations."[57]

---

[53] Docket 1 (Case No. 319).

[54] *See supra* notes 4, 7.

[55] *Califano v. Sanders*, 430 U.S. 99, 105 (1977).

[56] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *see* Native Villages Opening at 16-17; Friends Opening at 19-20; Defenders Opening at 32-33.

[57] 5 U.S.C. § 706(2).

Agency action is arbitrary and capricious if it:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.[58]

"In other words, there must be 'a clear error of judgment.'"[59]

By contrast, an agency action is proper if "the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made."[60] "[A] court is not to substitute its judgment for that of the agency," and such deference is especially appropriate where "the challenged decision implicates substantial agency expertise."[61]

"Whether agency action is 'not in accordance with law' is a question of statutory interpretation, rather than an assessment of reasonableness in the instant case."[62] When a statute is ambiguous, "the Supreme Court now instructs

---

[58] *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1067 (9th Cir. 2018) (quoting *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1023 (9th Cir. 2011)).

[59] *League of Wilderness Defs. Blue Mountains Biodiversity Proj. v. U.S. Forest Serv.*, 549 F.3d 1211, 1215 (9th Cir. 2008) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)).

[60] *Ctr. for Biological Diversity*, 900 F.3d at 1067 (quoting *Greater Yellowstone Coal.*, 665 F.3d at 1023).

[61] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[62] *Singh v. Clinton*, 618 F.3d 1085, 1088 (9th Cir. 2010) (citing *Nw. Env't Advocs. v. EPA*, 537 F.3d 1006, 1014 (9th Cir. 2008)).

courts to use their 'full interpretive toolkit' to find the 'best meaning' of ambiguous statutes rather than deferring to agency interpretations."[63] "[C]ourts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous."[64] Instead, a court must independently employ "the traditional tools of statutory construction . . . to resolve statutory ambiguities."[65]

"[A] policy change complies with the APA if the agency (1) displays 'awareness that it is changing position,' (2) shows that 'the new policy is permissible under the statute,' (3) 'believes' the new policy is better, and (4) provides 'good reasons' for the new policy, which, if the 'new policy rests upon factual findings that contradict those which underlay its prior policy,' must include 'a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy.'"[66]

---

[63] *Comm. for a Better Arvin v. EPA*, __ F.4th __, Case No. 24-7270, 2026 WL 2251528, at *4 (9th Cir. Aug. 5, 2026) (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 408-09 (2024)).

[64] *Loper Bright*, 603 U.S. at 413.

[65] *Id.* at 401.

[66] *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (quoting *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 515-16 (2009) (emphasis omitted)).

## DISCUSSION

### I. Preliminary Motions

NANA Regional Corporation, Inc. (NANA) moved to file the same amicus brief in each of the cases.[67] The Court granted NANA's motion in Case No. 319 upon Defenders' non-opposition.[68] NANA's motions are opposed and remain pending in Case No. 316 and Case No. 318.[69] Because the Court has considered the motions for summary judgment in these related cases together and has granted NANA leave to file the proposed amicus brief in Case No. 319, NANA's motions in Case Nos. 316 and 318 are each **DENIED as moot**.

Federal Defendants filed a motion for judicial notice in each of the cases, requesting the Court to take judicial notice of 12 prior land exchange agreements between the United States and Alaska Native Corporations within the boundaries of National Wildlife Refuges in Alaska.[70] Plaintiffs responded in opposition in their respective cases,[71] to which Federal Defendants replied.[72] Plaintiffs do not dispute

---

[67] Docket 34 (Case No. 316); Docket 34 (Case No. 318); Docket 41 (Case No. 319).

[68] Docket 42 (Case No. 319); Docket 43 (Case No. 319); *see* Docket 41-2 (Case No. 319) [hereinafter NANA Amicus Brief].

[69] Docket 35 (Case No. 316); Docket 35 (Case No. 318).

[70] Docket 23 (Case No. 316); Docket 24 (Case No. 318); Docket 32 (Case No. 319).

[71] Docket 28 (Case No. 316); Docket 28 (Case No. 318); Docket 34 (Case No. 319).

[72] Docket 31 (Case No. 316); Docket 31 (Case No. 318); Docket 37 (Case No. 319).

the authenticity of the 12 land-exchange agreements or that the agreements state what Federal Defendants represent, and that the Court may consider such public agency records as legislative facts relevant to statutory interpretation.[73] The APA's record-review rule also does not preclude judicial notice of the agreements because they are not offered to supplement the agency's factual findings,[74] and the Court's notice of their existence and contents does not determine what legal weight, if any, they carry. Accordingly, Federal Defendants' motions for judicial notice are each **GRANTED**. The Court takes judicial notice of the exhibits filed at Dockets 22-2 to 22-14 in Case No. 3:25-cv-00316-SLG, Dockets 23-2 to 23-14 in Case No. 3:25-cv-00318-SLG, and Dockets 30-2 to 30-14 in Case No. 3:25-cv-00319-SLG.

* * *

Plaintiffs challenge the Land Exchange Agreement under ANILCA, the APA, the Refuge Act, the Wilderness Act, NEPA, and the ESA.[75] Federal Defendants, KCC, and the State of Alaska dispute each claim and maintain that the Exchange and related agency actions are lawful.[76]

---

[73] Docket 28 (Case No. 316); Docket 28 (Case No. 318); Docket 34 (Case No. 319); *see Owino v. Holder*, 771 F.3d 527, 534 n.4 (9th Cir. 2014).

[74] *See Owino*, 771 F.3d at 534 n.4.

[75] Native Villages Opening at 18-45; Friends Opening at 20-45; Defenders Opening at 34-58.

[76] *See* Federal Defendants Resp. at 39-99; KCC Resp. at 28-68; State Resp. at 18-62.

## II. ANILCA § 1302(h)

The Court first considers whether the Secretary exceeded his authority under Section 1302(h) of ANILCA. Section 1302(h)(1) provides:

> Notwithstanding any other provision of law, in acquiring lands for the purposes of this Act, the Secretary is authorized to exchange lands (including lands within conservation system units and within the National Forest System) or interests therein (including Native selection rights) with the corporations organized by the Native Groups, Village Corporations, Regional Corporations, and the Urban Corporations, and other municipalities and corporations or individuals, the State . . . , or any Federal agency.[77]

The parties do not dispute that the Secretary relied on Section 1302(h) as the statutory authority for the Exchange. The parties also do not dispute that KCC, an Alaska Native Village Corporation, is an entity with which the Secretary may conduct an exchange under Section 1302(h). The dispute is whether the Secretary entered into the Exchange "in acquiring lands for the purposes of" ANILCA.[78]

### A. Statutory Purposes of ANILCA

At issue is the statutory interpretation of Section 101 of ANILCA, which is titled "Purposes."[79] Section 101(a) states: "In order to preserve for the benefit, use, education, and inspiration of present and future generations certain lands and

[77] 16 U.S.C. § 3192(h)(1).

[78] 16 U.S.C. § 3192(h)(1).

[79] When ANILCA was codified, the name of the section was changed to "Congressional statement of purpose." *See* 16 U.S.C. § 3101.

waters in the State of Alaska that contain nationally significant natural, scenic, historic, archeological, geological, scientific, wilderness, cultural, recreational, and wildlife values, the units described in the following titles are hereby established."

Section 101(b) states Congress's "intent" to preserve Alaska's scenic, geological, and natural values. Section 101(c) similarly identifies Congress's "intent and purpose" of protecting the opportunity for rural residents to continue a subsistence way of life. The parties agree that Sections 101(b) and (c) constitute purposes of ANILCA. The parties' dispute focuses on the meaning of Section 101(d), which provides:

> This Act provides sufficient protection for the national interest in the scenic, natural, cultural and environmental values on the public lands in Alaska, and at the same time provides adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people; accordingly, the designation and disposition of the public lands in Alaska pursuant to this Act are found to represent a proper balance between the reservation of national conservation system units and those public lands necessary and appropriate for more intensive use and disposition, and thus Congress believes that the need for future legislation designating new conservation system units, new national conservation areas, or new national recreation areas, has been obviated thereby.

In his Decision, the Secretary concluded that Section 101 sets forth three purposes of ANILCA—conservation, subsistence, and the economic and social needs of Alaska and its people—that must each be considered when authorizing

a land exchange pursuant to Section 1302(h).[80] In the Secretary's view, he could not "omit[] the economic and social needs of the State of Alaska and its people as a purpose of ANILCA . . . when evaluating an exchange under Section 1302(h)," because the requisite "balancing cannot fully ignore a foundational purpose of ANILCA."[81] Defendants and amicus curiae NANA all agree with the Secretary's interpretation of the statute.[82]

Plaintiffs assert that the Exchange was not authorized under Section 1302(h) because ANILCA's purposes are limited to conservation and subsistence.[83] Contrary to the Secretary's Decision, Plaintiffs assert that Section 101(d) does not identify Alaska's economic and social needs as a statutory purpose of ANILCA; rather, they maintain that Section 101(d) simply reflects Congress's determination that ANILCA itself struck the appropriate balance between conservation and the lands available for more intensive use and

---

[80] *See* LE_000030 ("Having reviewed the purposes of the proposed action in the 2024 Draft SEIS, I find that it misinterprets the requirements of ANILCA Section 1302(h) by focusing solely on furthering ANILCA's conservation and subsistence opportunities purposes in Section 101(b) and 101(c) and ignoring the Section 101(d) purpose of providing adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people.").

[81] LE_000030.

[82] Federal Defendants Resp. at 39-44; KCC Resp. at 41-44; State Resp. at 22-25; NANA Amicus Brief at 13-21.

[83] Native Villages Opening at 24-26; Friends Opening at 31-36; Defenders Opening at 37-40; *see* 16 U.S.C. § 3101(b), (c).

development[84] and "make[s] clear it is directed at future Congresses, not federal agencies."[85] Accordingly, in Plaintiffs' view, "Section 101(d) is not a basis for the Secretary to unilaterally adjust the balancing of conservation with social and economic interests that Congress achieved by designating Izembek as a National Wildlife Refuge and Wilderness area" when determining whether the Exchange was "for the purposes of" ANILCA under Section 1302(h).[86]

As an initial matter, the Court finds that Section 101 is ambiguous as to whether only Section 101(b) and (c) set forth the statutory purposes of ANILCA or if Section 101(d) also contains such a purpose.[87] Therefore, the Court does not defer to the Secretary's interpretation of Section 101(d) and his conclusion that it sets forth an additional statutory purpose of ANILCA to be considered in an exchange under Section 1302(h).[88] Instead, the Court employs "the traditional tools of statutory construction" to resolve statutory ambiguities.[89]

---

[84] Native Villages Opening at 24-26; Friends Opening at 31-36; Defenders Opening at 37-40.

[85] Defenders Opening at 37-38.

[86] Friends Opening at 31-33; *see also* Native Villages Opening at 24-26; Defenders Opening at 37-40; Friends Reply at 12-16.

[87] *See Woods v. Carey*, 722 F.3d 1177, 1181 (9th Cir. 2013) ("A statute is ambiguous if it gives rise to more than one reasonable interpretation.").

[88] *Loper Bright*, 603 U.S. at 413 ("[C]ourts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous.").

[89] *Id.* at 401.

"Statutory interpretation . . . begins with the text."[90] Courts must interpret statutory language "in [its] context and with a view to [its] place in the overall statutory scheme."[91] Section 101(d) is composed of three distinct clauses. The first clause states that "[t]his Act provides sufficient protection for the national interest in the scenic, natural, cultural and environmental values on the public lands in Alaska, and at the same time provides adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people." The Court reads this language as a congressional determination that ANILCA, as enacted, is intended to sufficiently protect two competing interests: the national interest in public lands in Alaska and the economic and social needs of Alaskans.

Section 101(d) continues, "accordingly, the designation and disposition of the public lands in Alaska pursuant to this Act are found to represent a proper balance between the reservation of national conservation system units and those public lands necessary and appropriate for more intensive use and disposition." The Court reads this clause as a congressional determination that ANILCA's creation of the extensive conservation units on public lands in Alaska and its designation of certain public lands for potentially more intensive use was intended

---

[90] *Ross v. Blake*, 578 U.S. 632, 638 (2016) (citing *Hardt v. Reliance Standard Life Ins. Co.,* 560 U.S. 242, 251 (2010)).

[91] *King v. Burwell*, 576 U.S. 473, 486 (2015) (quoting *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 133 (2000)).

as a compromise for the competing interests identified in the first clause of Section 101(d).

Lastly, Section 101(d) states "and thus Congress believes that the need for future legislation designating new conservation system units, new national conservation areas, or new national recreation areas, has been obviated thereby." Unlike the first two clauses, which are congressional determinations that ANILCA properly accommodates competing interests, this last clause is directed at Congress. The Court interprets this clause to mean that, because ANILCA was intended to reconcile conservation and development interests on public lands in Alaska, Congress did not intend to designate any additional acres of Alaska federal land as conservation system units, conservation areas, or national recreation areas in the future. The Court finds that the last clause does not render the preceding two clauses of Section 101(d) irrelevant to this Court's interpretation of ANILCA's statutory purposes.

Indeed, while Congress's work to set aside public lands in Alaska for conservation may have been complete upon passage of ANILCA, the Secretary's implementation of ANILCA was just then beginning. If ANILCA was enacted to strike a proper balance between the national interest in conservation and the economic and social needs of the State of Alaska and Alaskans, it follows that the Secretary may consider both sides of that balance when executing his authority

pursuant to ANILCA. Like the panel majority in *Friends of Alaska National Wildlife Refuges v. Haaland*, the Court finds that "[i]t would make little sense to say that the Secretary may not use [his land exchange] authority to satisfy the economic and social needs of Alaskans" because Section 101(d) "gave the Secretary discretion to strike an appropriate balance between environmental interests and 'economic and social needs.'"[92]

In addition, Section 101(d)'s use of forward-looking language—that ANILCA "provides adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people"—further suggests that Congress intended for the Secretary to consider the economic and social needs of Alaskans in implementing ANILCA. And as the Secretary determined here, one "adequate opportunity" of satisfying those needs would be through a land exchange that would allow for a road through Izembek. Further, while Section 101(d) does not contain the word "purpose," neither does Section 101(b) and yet all parties agree that Section 101(b) contains one of ANILCA's statutory purposes. The omission of the word "purpose" from Section 101(d) does not preclude this Court's finding

---

[92] *Friends of Alaska Nat'l Wildlife Refuges v. Haaland*, 29 F.4th 432, 439 (9th Cir.) [hereinafter *Friends of Alaska II*] (quoting 16 U.S.C. §§ 3101(d), 3192(h)(1)), *reh'g en banc granted, opinion vacated*, 54 F.4th 608 (9th Cir. 2022).

that the Secretary may consider the State's and Alaskans' economic and social needs in carrying out his authority pursuant to ANILCA.

"[A] view to [Section 101's] place in the overall statutory scheme" further supports the Court's conclusion that Section 101(d) sets forth an additional purpose of ANILCA.[93] ANILCA has 15 titles: Title I – Purposes, Definitions, and Maps (wherein Section 101(d) is located); Title II – National Park System; Title III – National Wildlife Refuge System; Title IV – National Conservation Area and National Recreation Area; Title V – National Forest System; Title VI – National Wild and Scenic Rivers System; Title VII – National Wilderness Preservation System; Title VIII – Subsistence Management and Use; Title IX – Implementation of Alaska Native Claims Settlement Act and Alaska Statehood Act; Title X – Federal North Slope Lands Studies, Oil and Gas Leasing Program and Mineral Assessments; Title XI – Transportation and Utility Systems In and Across, and Access Into Conservation System Units; Title XII – Federal-State Cooperation; Title XIII – Administrative Provisions; Title XIV – Amendments to the Alaska Native Claims Settlement Act and Related Provisions; and Title XV – National Need Mineral Activity Recommendation Process.[94]

---

[93] *King*, 576 U.S. at 486 (citation omitted).

[94] Pub. L. No. 96-487, 94 Stat. at 2371-74.

Many of ANILCA's titles are focused on establishing conservation units for the protection of the national interest in public lands in Alaska: Title II, Title III, Title IV, Title V, Title VI, and Title VII. And Title VIII addresses subsistence and establishes a subsistence priority for rural Alaskans.[95]

Other titles provide for the development of natural resources and other activities on public lands in Alaska. For example, Title X provides for the study and development of oil and gas resources on public lands. Specifically, Section 1001 of Title X directs the Secretary to conduct a "study of all Federal lands (other than submerged lands on the Outer Continental Shelf) in Alaska north of 68 degrees north latitude and east of the western boundary of the National Petroleum Reserve—Alaska [(NPR-A)], other than lands included in the [NPR-A] and in conservation system units established by this Act."[96] Upon completion of the study, the Secretary was to issue findings on

> (1) the potential oil and gas resources of these lands;
>
> (2) the impact of oil and gas development on the wildlife resources on these lands, particularly the Arctic and Porcupine caribou herds and the polar bear;

[95] Pub. L. No. 96-487, § 804, 94 Stat. at 2423 ("[T]he taking on public lands of fish and wildlife for nonwasteful subsistence uses shall be accorded priority over the taking on such lands of fish and wildlife for other purposes.") (codified at 16 U.S.C. § 3114); *see also* 16 U.S.C. § 3113 (defining "subsistence uses" to include "the customary and traditional uses by rural Alaska residents of wild, renewable resources for direct personal or family consumption as food, shelter, fuel, clothing, tools, or transportation").

[96] Pub. L. No. 96-487, § 1001(a), 94 Stat. at 2448 (codified at 16 U.S.C. § 3141).

> (3) the national need for development of the oil and gas resources of all or any portion of these lands;
>
> (4) the national interest in preservation of the wilderness characteristics of these lands; and
>
> (5) the national interest in protection of the wildlife resources of these lands.[97]

Section 1002 contains a similar directive for the Arctic National Wildlife Refuge.[98] And Section 1008 directs the Secretary to establish an oil and gas leasing program on federal lands in Alaska not covered by Section 1001 other than lands included in the NPR-A.[99] These sections demonstrate that, pursuant to ANILCA, the Secretary was required to address not only the national interest in conservation of public lands in Alaska but also resource development on certain of these lands.

---

[97] Pub. L. No. 96-487, § 1001(c), 94 Stat. at 2449 (codified at 16 U.S.C. § 3141).

[98] Pub. L. No. 96-487, § 1002, 94 Stat. at 2449-50 (codified at 16 U.S.C. § 3142(a)) ("The purpose of this section is to provide for a comprehensive and continuing inventory and assessment of the fish and wildlife resources of the coastal plain of the Arctic National Wildlife Refuge; an analysis of the impacts of oil and gas exploration, development, and production, and to authorize exploratory activity within the coastal plain in a manner that avoids significant adverse effects on the fish and wildlife and other resources.").

[99] Pub. L. No. 96-487, § 1008, 94 Stat. at 2454-55 ("The Secretary shall establish, pursuant to the Mineral Leasing Act of 1920, as amended, an oil and gas leasing program on the Federal lands of Alaska not subject to the study required by section 1001 of this Act, other than lands included in the National Petroleum Reserve—Alaska. Such program shall not be undertaken by the Secretary on those lands where applicable law prohibits such leasing or on those units of the National Wildlife Refuge System where the Secretary determines, after having considered the national interest in producing oil and gas from such lands, that the exploration for and development of oil or gas would be incompatible with the purpose for which such unit was established.") (codified at16 U.S.C. § 3148(a)).

By way of another example, Title XI governs the procedural process for the construction of transportation and utility systems in and across conservation system units. In deciding whether to approve an application for the construction of a transportation or utility system, Section 1104 requires the Secretary to consider and make findings as to

> (A) the need for, and economic feasibility of, the transportation or utility system; [and]
>
> . . .
>
> (D) short- and long-term social, economic, and environmental impacts of national, State, or local significance, including impacts on fish and wildlife and their habitat, and on rural, traditional lifestyles . . . .[100]

The plain language of Section 1104 requires the Secretary to consider not only whether a proposed transportation or utility system impacts conservation and subsistence, but also the "need for, and economic feasibility of that system," which supports a finding that one of ANILCA's purposes is to address the State of Alaska's and Alaskans' economic and social needs. Further, this Section makes clear that Congress intended the consideration of this purpose to occur throughout the Secretary's implementation of ANILCA and not just at the precise point in time that ANILCA was enacted.

---

[100] Pub. L. No. 96-487, § 1104, 94 Stat. at 2454-55 (codified at 16 U.S.C. § 3164(g)(2)(A), (D), (F)).

For the foregoing reasons, the Court finds that Section 101(d) itself, and when viewed in its place in ANILCA's overall statutory scheme, sets forth a statutory purpose of ANILCA: to address the State of Alaska's and Alaskans' economic and social needs. As such, the Court finds that the Secretary's consideration of those needs in approving the Exchange did not run afoul of ANILCA.[101]

**B. The Exchange**

Having found that one of the purposes of ANILCA is to address the economic and social needs of Alaska and its citizens, the Court turns to whether the Secretary's decision that the Exchange met ANILCA's purposes was arbitrary and capricious in violation of the APA.

Plaintiffs maintain that "[b]y elevating social and economic needs above conservation, the Secretary failed to ensure that the exchange achieves the purposes of ANILCA and Izembek."[102] The Court agrees with Plaintiffs that the Secretary was required to consider the conservation and subsistence purposes of

[101] Because the Court finds that the Secretary's consideration of King Cove's economic and social needs was not improper, the Court need not reach Defendants' alternative argument that even if "ANILCA's purposes exclude the economic and social needs of Alaskans, . . . the text of Section 1302(h) requires the Secretary to consider only whether he is 'acquiring lands for the purposes of' ANILCA . . . and not net tradeoffs from an exchange." Federal Defendants Resp. at 46; *see also* KCC Resp. at 29-30; State Resp. at 19-22.

[102] Friends Opening at 35-36; *see also* Native Villages Opening at 25 (arguing that the Exchange "will have significant adverse effects on both conservation and subsistence values that Izembek Refuge was created to protect.").

ANILCA in determining whether the Exchange was "for the purposes of" ANILCA under Section 1302(h). Indeed, that is the only way the Secretary could determine if the Exchange would preserve the balance between the national interest in conservation, subsistence uses, and the economic and social interests of the State and Alaskans.

The Court finds that the Secretary undertook the requisite consideration of the conservation and subsistence implications of the Exchange while also considering the economic and social benefits that the Exchange would provide to the State of Alaska and particularly to the residents of King Cove. Under "Conservation Values of the U.S. Exchange Lands," the Secretary "recognize[d] that the exchange and conveyance of the U.S. Exchange Lands would remove Service management and current protection of the conservation values in this corridor of land through the isthmus" and that "[t]he proposed road, if constructed, will have impacts on the conservation values of the Izembek Refuge and Izembek Wilderness both from its construction and from its operation and maintenance."[103]

As to the lands conveyed from KCC to the United States, the Secretary found

> that there will be important conservation benefits to both of these components of the exchange. In particular, . . . more acres will be managed as wilderness and refuge lands under the Proposed Land

[103] LE_000031.

> Exchange than if the Proposed Land Exchange does not occur and . . . Service management of the KCC Exchange Lands after acquisition and continued Service management of the 5,430 acres of KCC-selected lands will further conservation values of the Izembek Refuge and Izembek Wilderness.[104]

The Secretary also specifically addressed the conservation benefit of the KCC lands near the Kinzarof lagoon that the federal government acquired in the Exchange.[105]

Regarding subsistence, the Secretary referred to the Service's ANILCA Section 810 Analysis, appended to his Decision.[106] The Secretary acknowledged that the Service had concluded that the cumulative impacts from the Exchange and reasonably foreseeable past, present, and future activities in or near the proposed exchange parcels "may significantly restrict subsistence uses for the communities of King Cove, Cold Bay, False Pass, Nelson Lagoon, and Sand Point through reduced harvesting opportunities and alterations in subsistence harvesting patterns," but he expressed "reservations about this determination."[107] The Secretary also adopted the Service's finding that the cumulative impacts "would

---

[104] LE_000031.

[105] LE_000031-32.

[106] LE_000032 (citing LE_0000127-29).

[107] LE_000032-33; *see also* LE_000045-51.

not significantly restrict subsistence uses for" "Hooper Bay and other communities in the Yukon-Kuskokwim Delta."[108]

The Secretary further noted that "the acquisition of the rights to the surface of the KCC Exchange Lands will result in the Service and Federal Subsistence Board managing the lands to provide the subsistence priority to rural residents (instead of having KCC manage access to the lands for hunting and fishing and having state hunting and fishing laws apply)."[109] The Decision then quoted testimony from ANILCA Section 810 hearings in King Cove at which residents testified that the road would make is easier for them to access subsistence resources, particularly those resources around Cold Bay that, without the road, are now more easily accessed by non-subsistence hunters.[110]

The Secretary then considered the impact of the Exchange on state and local economic and social needs. He concluded that "[t]he [E]xchange would have major beneficial effects to the economic and social needs of the State of Alaska and the people of King Cove by improving public health and safety and transportation with the addition of surface transportation for people in King Cove

---

[108] LE_000033.

[109] LE_000033.

[110] LE_000033-34.

to travel to the Cold Bay airport for access to advanced medical services and for other purposes."[111]

The Secretary then recounted testimony by King Cove residents regarding the need for safe and reliable access to the all-weather airport in Cold Bay: residents testified that the road would ease transportation issues from King Cove to Cold Bay during bad weather or non-business hours particularly for medical emergencies that require medical evacuation to Anchorage, and "would help us with access to things we need to survive," such as more affordable food and higher quality produce.[112]

---

[111] LE_000034-35. Native Villages maintains that "even if 'satisfaction of the economic and social needs of the State of Alaska and its people' were a purpose of ANILCA, the Exchange Agreement and road do not meet those purposes because the Secretary's decision only addresses the social and economic needs of a single Alaska community and disregards the needs of all other Alaskan people, including Native Villages, whose social and economic interests are harmed by the Exchange Agreement." Native Villages Opening at 25-26. The Court disagrees. It was reasonable for the Secretary to focus on the effects of the Exchange on King Cove residents and residents of the five nearest communities because the Exchange's impact will likely be greatest on the closest communities.

[112] LE_000035 ("And, of course, this would help us with access to things we need to survive. Like, we can't even afford to buy, like, a cart of produce here, and even when it does get here, it's just gross, it's way overpriced."); LE_000035 ("13 times we had to sit up there all night waiting to find a way to Cold Bay. Those waits never get easier -- sorry. Those waits never get easier as a mother watching your child fight to breathe while you have nothing to do. . . . The medevac plane was ready in Cold Bay waiting for us, but we had no way to get there."); LE_000036 ("My mom has been one of the most recent deaths due to the lack of transport out of King Cove, but she's not the first, and I can guarantee she won't be the last. […] I'd like to point out the highlighted part [on my mother's death certificate] that says the underlying cause is transport delayed treatment."); *see* LE_000035-38 (compiling community member testimony).

The Secretary ultimately concluded that the Exchange "furthers the purposes of ANILCA" because

> it strikes the proper balance between protection of scenic, natural, cultural, and environmental values; provides opportunities for continued subsistence uses; and, more generally, for the long-term social and physical well-being of the State of Alaska and in particular the public health and safety and a broader set of economic and social needs of the Native and non-Native residents of King Cove.[113]

The Secretary explained that while there were "many reasons" for his Decision, "[a]t the forefront is that the Proposed Land Exchange will provide KCC with an opportunity to provide for the health and safety of its members and the community of King Cove by allowing KCC to pursue the construction and development of a road from King Cove to the airport in Cold Bay, Alaska."[114]

This case presents a unique set of circumstances, one in which residents of King Cove have been effectively cut off from safe and reliable access to the all-weather airport in Cold Bay following the passage of ANILCA and the creation of the Refuge. In short, applying the deferential standard of review under the APA to the Secretary's determination, the Court finds that the Secretary did not make "a clear error of judgment" in concluding that the Exchange furthers the purposes of

---

[113] LE_000038.

[114] LE_000038.

ANILCA, including its conservation and subsistence purposes as well as the economic and social needs of the State of Alaska and Alaskans.[115]

## III. Title XI of ANILCA

The Court turns to whether the Secretary violated ANILCA by failing to comply with Title XI. Plaintiffs maintain that Title XI applies to the Exchange because the purpose of the Exchange is to create a transportation system—specifically, a road through the Izembek Refuge.[116]

Title XI reflects Congress's determination that "applications for transportation and utility systems through public lands in Alaska" should be considered through "a single comprehensive statutory authority."[117] Congress enacted Title XI "to minimize the adverse impacts of siting transportation and utility systems within units established or expanded by" ANILCA and "to insure the effectiveness of the decisionmaking process."[118] Title XI provides:

---

[115] *Blue Mountains Biodiversity Proj.,* 549 F.3d at 1215 (quoting *Marsh*, 490 U.S. at 378).

Plaintiffs also argue that Section 1302(h) may only be used to acquire inholdings that are at risk of condemnation. *See* Friends Opening at 28-30; Native Village Opening at 22-23; Defenders Opening at 22. Section 1302 is under Title XIII – "Administrative Provisions" and is titled "Land Acquisition Authority." § 1302, 94 Stat. at 2474. Nothing in the name of the title or section suggests that Section 1302 applies only to inholdings that are facing condemnation. Indeed, the word condemnation or a variant thereof is not found in Section 1302 at all.

[116] Native Villages Opening at 23-24; Friends Opening at 21-26; Defenders Opening at 21-22.

[117] 16 U.S.C. § 3161(b)-(c).

[118] *Id.* § 3161(c).

> Notwithstanding any provision of applicable law, no action by any Federal agency under applicable law with respect to the approval or disapproval of the authorization, in whole or in part, of any transportation or utility system shall have any force or effect unless the provisions of this section are complied with.[119]

Title XI defines "applicable law" as "any law of general applicability" under which a federal agency "has jurisdiction to grant any authorization (including but not limited to, any right-of-way, permit, license, lease, or certificate) without which a transportation or utility system cannot, in whole or in part, be established or operated."[120] A "transportation or utility system" includes a road if "any portion of the route of the system will be within [a] conservation system unit."[121] When a proposed road would "occupy, use, or traverse any area within" designated wilderness lands, an agency cannot issue the authorization unless "the President approves the application" and Congress enacts a joint resolution approving the system.[122]

In *Friends of Alaska I*, Judge Sedwick considered whether Title XI applied to a land exchange agreement to convey public lands for the purposes of building

---

[119] *Id.* § 3164(a).

[120] *Id.* § 3162(1).

[121] *Id.* § 3162(4)(A), (B)(vii).

[122] *Id.* § 3166(b)–(c).

a road—indeed, the same road at issue here.[123] He concluded that "the Exchange Agreement is in fact an approval of a transportation system that falls within the ambit of Title XI" and "[t]he Secretary's argument to the contrary elevates form over substance."[124] In that case—as is the case here—it was "undisputed that the purpose of the Exchange Agreement [was] to provide a corridor of land through Izembek to facilitate the building of a road" and the land exchange was "the required first step in the completion of such a road."[125]

On appeal to the Ninth Circuit, in *Friends of Alaska II*, the panel majority disagreed with Judge Sedwick, holding that a land exchange pursuant to ANILCA Section 1302(h) falls outside the scope of Title XI.[126] In the panel majority's view, Section 1302(h) "authorizes the Secretary only 'to exchange lands'" and not "'to grant any authorization' necessary for a 'transportation or utility system.'"[127] The panel majority acknowledged that, "[t]o be sure, once lands are transferred, the recipient might use them to build a road," which was "the purpose of the transfer at issue here. But under Title XI, [the majority held that] a 'transportation or utility

[123] *Friends of Alaska I*, 463 F. Supp. 3d at 1015-17, 1024-25.

[124] *Id.* at 1024-25.

[125] *Id.* at 1025.

[126] *Friends of Alaska II*, 29 F.4th at 443-44.

[127] *Id.* (first quoting 16 U.S.C. § 3192(h)(1); and then quoting 16 U.S.C. § 3162(1)).

system' includes only systems for which a 'portion of the route of the system will be within any conservation system unit, national recreation area, or national conservation area,'" and "[l]and transferred out of a conservation system unit in a land exchange is, by definition, no longer 'within any conservation system unit.'"[128]

In her dissent, Judge Wardlaw disagreed with the panel majority's holding regarding Title XI.[129] Judge Wardlaw agreed with Judge Sedwick that, because the land exchange was the first step toward the completion of a road, without which "the 'transportation . . . system cannot, in whole or in part be established or operated,'" the land exchange pursuant to Section 1302(h) "[fell] squarely within Title XI's definition of applicable law."[130]

The plaintiff-appellees in *Friends of Alaska II* filed a petition for rehearing en banc; in their petition, they argued that rehearing was warranted because, in their view, "[t]he majority's misinterpretation of ANILCA creates a loophole that swallows Title XI, threatening all conservation units in Alaska" and "allow[ing] the Secretary to override Congress in allowing for roads through Wilderness."[131] While the

---

[128] *Id.* at 444 (quoting 16 U.S.C. § 3162(4)(A)).

[129] *Id.* at 452 (Wardlaw, J., dissenting).

[130] *Id.* at 453 (Wardlaw, J., dissenting) (quoting 16 U.S.C. § 3162(1)).

[131] Pet. for Reh'g En Banc at 19, *Friends of Alaska Nat'l Wildlife Refuges v. Haaland*, Case No. 20-35721 (9th Cir. 2022).

petition was granted and the panel opinion vacated, the appeal was eventually dismissed as moot.

Defendants do not contend that the Secretary followed Title XI's procedures. Instead, they maintain that Title XI does not apply to the Exchange for several reasons.[132] First, Defendants assert that the exchanged lands are not a "transportation system" under Title XI and the Secretary's Decision to enter into the Exchange "does not authorize construction of a road."[133] As explained by KCC, "the Secretary authorized 'a **corridor** for the construction and operation of a public road between King Cove and Cold Bay . . ."[134] But while the Exchange itself does

---

[132] Federal Defendants Resp. at 47-51; KCC Resp. at 33-41; State Resp. at 31-34.

In his Decision, the Secretary stated

> Title XI of ANILCA provides a process for obtaining federal authorizations associated with a 'transportation or utility system' (TUS), which includes roads, when any portion of the proposed route is located on public lands within any conservation system unit, national recreation area, or national conservation area in Alaska. Pursuant to Section 1104 of ANILCA, each applicant for a TUS must file a single consolidated application with each appropriate federal agency having jurisdiction to grant any authorization without which the system cannot be established or operated. . . . The Department does not have a pending application for a TUS before it.

LE_000056. But the fact that the Department did not have a pending application before it does not mean that the Exchange is not an "authorization, in whole or in part, of any transportation . . . system," 16 U.S.C. § 3164(a). Further, KCC's request to the Department to enter into the equal value land exchange so it could construct the road through the Izembek Refuge could be considered an application for partial authorization to build a road.

[133] Federal Defendants Resp. at 48-49; KCC Resp. at 34.

[134] KCC Resp. at 34 (emphasis in original) (quoting LE_000023).

not explicitly "authorize" the construction of the road, it conveys a portion of the Izembek Refuge for the express purpose of enabling that proposed road to be built and dictates the exact route the road will take through the Izembek Refuge.[135] Further, in the Exchange Agreement, KCC agreed to multiple conditions imposed by the United States with respect to the design, construction, operation, maintenance, and mitigation efforts for a road on the conveyed lands.[136] The Court therefore agrees with Judge Sedwick and Judge Wardlaw and finds that, because without the Exchange "the 'transportation . . . system cannot, in whole or in part be established or operated,'" the Exchange constitutes the critical first step in the authorization of the road's construction.

Defendants also assert that Title XI does not apply to the Exchange because, once the land is conveyed to KCC, the corridor will no longer be federal land within the Izembek Refuge, such that any road later constructed there will not

[135] *See* LE_005493 ("The Purpose of the 2025 Proposed Land Exchange would be to provide for a road corridor that allows for the construction and operation of a long-term, safe, reliable, and affordable year-round road between the City of King Cove and the all-weather airport at Cold Bay."); LE_005434 (same); LE_000006 ("providing KCC with lands that would allow KCC to pursue the construction and operation of a long-term, safe, reliable, and affordable year-round road from King Cove to the airport in Cold Bay.").

[136] LE_000016-28; LE_000064-65. ("KCC has also committed to mitigation measures as part of the Final Proposed Action with Addendum for the proposed Izembek Land Exchange, dated October 14, 2025, for design, construction, operation, and maintenance of the road corridor; these measures are incorporated into this Agreement.").

be "within" a conservation system unit.[137] But Defendants cannot rely on the Exchange's removal of the corridor from the Refuge—the very action alleged to require Title XI compliance—as the reason why Title XI does not apply. At the time of the Secretary's Decision approving the Exchange, the proposed road corridor was within the Izembek Refuge.

Further, Section 1104 of Title XI requires the Secretary, in approving or disapproving an authorization with respect to a transportation system, to make "a determination with respect to whether there is any economically feasible and prudent alternative to the routing of the system *through or within* a conservation system unit, national recreation area, or national conservation area . . . ."[138] And Section 1106 provides that for "approval of a transportation or utility system . . . that proposes to occupy, use, or *traverse* any area within the National Wilderness Preservation System," the agency must comply with certain notification requirements.[139] These statutory provisions suggest that Congress intended a broader reading of the applicability of Title XI, consistent with Congress's purpose in passing Title XI as a single statutory scheme to govern the siting of

---

[137] Federal Defendants Resp. at 48–49; KCC Resp. at 33–37; *see* 16 U.S.C. § 3162(4)(A).

[138] Pub. L. No. 96-487, § 1104, 94 Stat. at 2460 (codified at 16 U.S.C. § 3164(g)(2)(B)) (emphasis added).

[139] Pub. L. No. 96-487, § 1106, 94 Stat. at 2462 (emphasis added) (codified at 16 U.S.C. § 3166(b)(1)).

"transportation and utility systems through public lands in Alaska."[140] Defendants' interpretation would allow the Secretary to circumvent Title XI's requirements simply by conveying through an exchange of lands a corridor for a transportation system through wilderness lands.

Next, Defendants and NANA assert that Section 1302(h) is not an "applicable law" under Title XI because Section 1302(h) only authorizes the Secretary "to exchange lands," not to grant a right-of-way, permit, license, or any other governmental authorization to construct a road on public lands.[141] Title XI defines "applicable law" to include a law under which an agency may grant an authorization "without which" the system cannot, "in whole or in part," be established or operated.[142] "Authorization" includes but is "not limited to any right-of-way, permit, license, lease, or certificate."[143] The statute does not limit what is considered an "authorization," and the Court finds that the conveyance of land effectuated by the Exchange is similar to the granting of a right of way. A "right of way" is "a legal right of passage over another person's ground."[144] A right of way

---

[140] 16 U.S.C. § 3161(b).

[141] Federal Defendants Resp. at 49–51; KCC Resp. at 38-41; NANA Amicus Brief at 21-24.

[142] 16 U.S.C. §§ 3162(1), 3164(a).

[143] *Id.* § 3162(1).

[144] *Right-of-Way*, *Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/right-of-way (last visited Aug. 12, 2026).

does not, in and of itself, "authorize" the construction of a road. Yet Congress clearly intended such a right of passage to be subject to Title XI's requirements. That additional authorizations may be necessary before the road is actually constructed does not exempt the Exchange from the requirements of Title XI.

NANA cites to *Sturgeon v. Frost* where the Supreme Court quoted a Senate Report on ANILCA explaining that "state, Native, and private lands in the new Alaskan parks would be subject to '[f]ederal laws and regulations of general applicability,' such as 'the Clean Air Act, the Water Pollution Control Act, [and] U.S. Army Corps of Engineers wetlands regulations.'"[145] The next sentence in *Sturgeon* states: "But that would not be so of regulations applying only to parks."[146] NANA argues that Section 1302(h) is not a law of general applicability, as it only applies to exchanges of federal lands. The Court disagrees. An "applicable law" for purposes of Title XI is any law of general applicability under which a federal agency has jurisdiction to grant an authorization without which a transportation or utility system cannot be established.[147] Section 1302(h) broadly authorizes the Secretary to exchange public lands with anyone: "with the corporations organized

---

[145] NANA Amicus Curiae Brief at 21-22 (quoting *Sturgeon*, 587 U.S. at 54 (alteration in original)); *see* S. Rep. No. 96–413, p. 303 (1980).

[146] *Sturgeon*, 587 U.S. at 54.

[147] 16 U.S.C. § 3162(1).

by the Native Groups, Village Corporations, Regional Corporations, and the Urban Corporations, and other municipalities and corporations or individuals, the State . . . , or any Federal agency."[148] As such, the Court finds that for purposes of Title XI, Section 1302(h) is more akin to a law of general applicability than to a regulation regarding the management of national park land.

Defendants also rely on Section 1302(h)'s authorization of exchanges "[n]otwithstanding any other provision of law" to assert that Section 1302(h) is exempt from Title XI.[149] However, Title XI similarly provides that, "[n]otwithstanding any provision of applicable law," no federal action concerning the authorization of a transportation system "shall have any force or effect" unless Title XI is followed.[150] The reach of a notwithstanding clause depends on "the whole of the statutory context in which it appears,"[151] and a court must give effect, where possible, to both provisions. Here, both provisions can be given effect without conflict: Section 1302(h) authorizes land exchanges generally, while Title XI requires additional procedures when the purpose of the exchange is to effectuate the construction of a road through a wilderness area. And because the

---

[148] 16 U.S.C. § 3192(h)(1).

[149] Federal Defendants Resp. at 49–51; KCC Resp. at 38-41.

[150] 16 U.S.C. § 3164(a).

[151] *United States. v. Novak*, 476 F.3d 1041, 1046 (9th Cir. 2007) (en banc) (citing *Or. Natural Res. Council v. Thomas,* 92 F.3d 792, 797 (9th Cir. 1996)).

Exchange is the critical first step in the authorization of the proposed road, the Secretary was required to comply with both Section 1302(h) and Title XI.[152]

Lastly, the State asserts that Title XI does not apply to the Exchange because Section 1110(b) provides a separate means by which an owner of an inholding can seek "adequate and feasible access."[153] But the Secretary approved this Exchange under Section 1302(h), not Section 1110(b). Therefore, whether Section 1110(b) provides a different statutory process exempt from Title XI is not before the Court.

Based on the foregoing, the Court concludes that the Exchange was subject to the requirements of Title XI, and because the Secretary did not comply with Title XI, the Exchange has no "force or effect."[154]

## IV. ANILCA Section 810

"The purpose of ANILCA § 810 is to protect Alaskan subsistence resources from unnecessary destruction," but it "does not prohibit all federal land use actions

[152] In its amicus curiae brief, NANA maintains that Title XI does not apply to exchanges pursuant to Section 1302(h) because "Congress did not intend for Title XI to apply to land exchanges" with Alaska Native Regional and Village Corporations. Docket 41-2 at 22. However, Section 1302(h)(1) authorizes the Secretary to enter into land exchanges "with the corporations organized by the Native Groups, Village Corporations, Regional Corporations, and the Urban Corporations, and other municipalities and corporations or individuals, the State . . . , or any Federal agency." By its own terms, Section 1302(h) is therefore not limited to exchanges with Alaska Native Regional and Village Corporations.

[153] 16 U.S.C. § 3170(b); State Resp. at 32-33.

[154] 16 U.S.C. § 3164(a).

which would adversely affect subsistence resources."[155] Rather, it "sets forth a procedure through which such effects must be considered and provides that actions which would significantly restrict subsistence uses can only be undertaken if they are necessary and if the adverse effects are minimized."[156]

ANILCA Section 810 establishes "a two-step process: first, the agency determines whether the contemplated action may significantly restrict subsistence use" by evaluating (1) "the effect of such use, occupancy, or disposition [of public lands] on subsistence uses and needs," (2) "the availability of other lands for the purposes sought to be achieved," and (3) "other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes" (referred to as the Tier 1 evaluation).[157] Second, if the agency determines that the proposed action may significantly restrict subsistence use, then it "must comply with the notice and hearing procedures" laid out in Section 810(a)(1)-(3) (referred to as the Tier 2 evaluation).[158] As part of the Tier 2 evaluation, the agency must give notice to the appropriate State agency, local

---

[155] *Amoco Prod. Co.*, 480 U.S. at 544.

[156] *Id.*

[157] *Kunaknana v. Clark*, 742 F.2d 1145, 1150-51 (9th Cir. 1984) (quoting 16 U.S.C. § 3120(a)).

[158] *Id.* at 1151.

committees, and regional councils; give notice of and hold a hearing in the vicinity of the area involved; and determine that

> (A) such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of the public lands, (B) the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other disposition, and (C) reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from such actions.[159]

Section 810's procedural requirements are similar to NEPA's requirements;[160] pursuant to Section 810's terms, an agency proposing an action resulting in the "use, occupancy, or disposition of public lands" must evaluate that action's effects on "subsistence uses and needs."[161] And "[b]oth NEPA and ANILCA require [an agency] to consider reasonable alternatives to a proposed action."[162] Due to their similarities, courts have analyzed the procedural requirements of NEPA and ANILCA under the same standard.[163] Thus, in

---

[159] 16 U.S.C. § 3120(a)(1)-(3).

[160] *City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1310 (9th Cir. 1990) ("The NEPA provisions and underlying regulations are designed to insure careful study of the environmental impact of government action. The relevant provisions of ANILCA are intended to minimize the impact of a proposed project on resources which rural village residents of Alaska use for subsistence.").

[161] 16 U.S.C. § 3120(a).

[162] *Tenakee Springs*, 915 F.2d at 1310.

[163] *See, e.g., Tenakee Springs*, 915 F.2d at 1310-12 (evaluating adequacy of an Environmental Impact Statement's consideration of alternatives under NEPA and ANILCA together); *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 731 (9th Cir. 1995) (same); *Sierra Club v. Penfold*, 664 F. Supp. 1299, 1307 (D. Alaska 1987) ("NEPA case law is helpful in

reviewing a challenge to an agency action pursuant to Section 810, as in the NEPA context, the Court will "afford substantial deference and . . . not micromanage those agency choices so long as they fall within a broad zone of reasonableness."[164]

In its Section 810 analysis, the Service determined that "[t]he cumulative case may result in a significant restriction to subsistence uses for the communities of King Cove, Cold Bay, False Pass, Nelson Lagoon, and Sand Point, but would not result in a significant restriction to subsistence uses for other communities, including those in the Yukon-Kuskokwim Delta."[165] The Service then complied with the notice and hearing requirements of Tier 2.[166] Based on comments received from communities in the Yukon-Kuskokwim region, "the Service revised the ANILCA Section 810 analysis . . . regarding the status of migratory birds (particularly brant) in the Yukon-Kuskokwim region."[167]

In his Decision, the Secretary "disagree[d] with the assumptions about the past, present, and reasonably foreseeable future actions that supported the [Service's] determination" and found "that the record provides, at most, marginal

---

interpreting § 810.").

[164] *Seven Cnty. Infrastructure Coal. v. Eagle County*, 605 U.S. 168, 183 (2025).

[165] LE_000139; *see also* AN_060068 (finding that "the cumulative effects of the road are not expected to result in a substantial loss of migratory birds for Yukon-Kuskokwim communities").

[166] LE_000142.

[167] LE_000142.

support for the finding that the Proposed Land Exchange, in conjunction with past, present, and reasonably likely future actions (the cumulative case) 'may significantly restrict subsistence uses' for the five communities in the vicinity of the Proposed Land Exchange."[168] The Secretary also noted that the Service applied a "may significantly restrict" standard at Tier 1, but that, in his view, the correct standard is "would significantly restrict."[169] Applying that standard, the Secretary determined that the cumulative case "*would not* significantly restrict subsistence uses," and therefore a Tier 2 evaluation was not required.[170] But, in any event, the Secretary "reviewed and concur[red] with the [Tier 2] determinations made by the Service."[171]

Native Villages maintain that the Secretary's adoption of the Service's "finding of no significant restriction of subsistence uses for Yukon-Kuskokwim communities was unlawful" because the Service "(1) relied on an unsupported and arbitrary evaluation of [the] effects [of the action on brant and emperor geese and associated subsistence impacts]; and (2) failed to consider the availability of other

---

[168] LE_000050.

[169] LE_000046 (citing *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt*., 141 F.4th 976, 1004-05 (9th Cir. 2025)); *see* 16 U.S.C. § 3120(a). *But see Kunaknana*, 742 F.2d at 1151 (holding that Tier 2 requirements are necessary "if the agency concludes that the contemplated action may significantly restrict subsistence uses").

[170] LE_000050 (emphasis in original).

[171] LE_000051.

lands for the purposes sought to be achieved or other alternatives that would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes."[172]

The Yukon-Kuskokwim region where Natives Villages are located is nearly 500 miles from the Izembek Refuge.[173] In reaching its finding that the proposed road would not result in a significant restriction on subsistence uses in the Yukon-Kuskokwim Delta, the Service examined migration studies and concluded that "Yukon-Kuskokwim breeding brant typically winter farther south and therefore would not experience increased disturbances associated with the road during the late fall and winter hunt."[174] The Service also noted that black brant and emperor geese provide only 0.56% of the "total subsistence harvest in individual Yukon-Kuskokwim communities," varying between 0 to 2.2% for individual communities in that region.[175] But the Service nonetheless acknowledged that these bird "species have particular cultural, spiritual, and nutritional importance" to certain Yukon-Kuskokwim communities."[176]

---

[172] Native Villages Opening at 26.

[173] *See* Federal Defendants Resp. at 55 (citing Native Villages Opening at 26-32).

[174] LE_000141; *see also* LE_000134-35.

[175] LE_000134-35; LE_000141.

[176] LE_000135.

Native Villages point to other evidence in the record that they maintain demonstrates that the Service's no significant impact determination for their communities "runs counter to the evidence before the agency."[177] For example, Native Villages note that the Service concluded that "the Yukon-Kuskokwim region may be particularly vulnerable to impacts on [emperor geese, brant, and cackling/Canada geese] if the cumulative impacts of the road corridor result in a substantial reduction in abundance or a major redistribution in resources."[178] Native Villages also note the following evidence in the record: (1) a 2021 survey "showed that over one-third of Hooper Bay households used Pacific black brant and nearly one-quarter of households used emperor geese"; (2) studies from 2018 and 2019 showed that the Yukon-Kuskokwim region accounts for over half of all emperor goose harvests and one-third of all brant harvests; and (3) black brant and emperor geese comprise about 20% of the total migratory bird harvest for the coastal communities of Chevak, Hooper Bay, and Scammon Bay.[179]

The Court finds that the Service's weighing of the evidence regarding the road's impact on subsistence use of brant and emperor geese in the Yukon-

[177] Native Villages Opening at 31 (first quoting *Orutsararmiut Native Council v. U.S. Army Corps*, 751 F. Supp. 3d 971, 976 (D. Alaska 2024); and then citing 5 U.S.C. § 706(2)(A)).

[178] LE_000135.

[179] LE_000135

Kuskokwim region in reaching its no significant impact determination "fall[s] within a broad zone of reasonableness" and is not unlawful.[180] The Court finds that the Service gave due consideration to subsistence uses in the Yukon-Kuskokwim region and its determination of no significant impact "is [not] so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[181] Therefore, the Secretary's adoption of the Service's no significant impact determination for the Yukon-Kuskokwim region was not arbitrary and capricious.

Native Villages also maintain that the Service failed to adequately consider alternatives other than the Land Exchange that would reduce or eliminate the use of public lands needed for subsistence.[182] Specifically, Native Villages "repeatedly asked the Service to consider a marine alternative that would meet King Cove's transportation needs and also protect the migratory birds on which Native Villages rely."[183]

---

[180] *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 183. Because the Court finds that the Service lawfully concluded that the cumulative impacts of the Exchange and past, present, and reasonably foreseeable future actions are not expected to result in a significant restriction of subsistence uses for communities in the Yukon-Kuskokwim Delta, the Court does not consider Native Villages' further argument that "[b]ecause the action may result in a significant restriction of subsistence uses and needs for Native Villages, the Service violated ANILCA by not complying with section 810's additional requirements." Native Villages Opening at 33-34.

[181] *Ctr. for Biological Diversity*, 900 F.3d at 1067 (alteration added) (quoting *Greater Yellowstone Coal.*, 665 F.3d at 1023).

[182] Native Villages Opening at 32-33.

[183] Native Villages Reply at 20 (citing Native Villages Opening at 32-33).

In its Section 810 analysis, the Service reviewed six previously analyzed alternatives, including marine alternatives, before concluding that none would satisfy the Exchange's purpose for various reasons.[184] In light of the "substantial deference" owed to the agency's consideration of alternatives and because the agency's alternatives analysis "fall[s] within a broad zone of reasonableness," the Secretary's adoption of the Service's alternatives analysis was not unlawful.[185]

For the foregoing reasons, the Secretary complied with ANILCA Section 810 in adopting the Service's subsistence analysis.[186]

## V. NEPA

Friends of Alaska contend that the Secretary violated NEPA because no Environmental Impact Statement (EIS) was prepared for the Exchange.[187] The Secretary concluded that Section 910 of ANILCA "provides an express exemption from NEPA" because the Exchange is a conveyance of land pursuant to ANILCA from the United States to KCC, a Native Corporation pursuant to ANCSA.[188]

---

[184] AN_060053-54, AN_067630, AN_067646; LE_000127 ("The 2024 Draft [Supplemental Environmental Impact Statement ("SEIS")] considered two action alternatives (Alternatives 4 and 5) which propose the use of marine transportation and allow for a transportation route between King Cove and Cold Bay without the need for a land exchange, and therefore new use of federal public lands.").

[185] *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 183.

[186] *See Ctr. for Biological Diversity*, 141 F.4th at 1006 (quoting 16 U.S.C. § 3120(a)).

[187] Friends Opening at 42-45.

[188] LE_000045 (first citing 42 U.S.C. § 4336(a)(3); and then citing 516 Departmental Manual 1 –

Friends of Alaska maintain that conclusion is erroneous because, in their view, Congress intended that Section 910 only applies to "conveyances necessary to meet ANCSA entitlements."[189]

Section 910 of ANILCA, codified at 43 U.S.C. § 1638, provides:

> The National Environmental Policy Act of 1969 (83 Stat. 852) shall not be construed, in whole or in part, as requiring the preparation or submission of an environmental impact statement for withdrawals, conveyances, regulations, orders, easement determinations, or other actions which lead to the issuance of conveyances to Natives or Native Corporations, pursuant to the Alaska Native Claims Settlement Act, or this Act . . . .

By its unambiguous plain terms, Section 910 applies to any conveyance of land pursuant to "this Act," meaning ANILCA. The Exchange conveys land to KCC pursuant to Section 1302(h) of ANILCA. Therefore, Section 910 applies and the Secretary was not required to prepare an EIS for the Exchange.[190]

---

U.S. Department of the Interior Handbook of National Environmental Policy Act Implementing Procedures, Section 1.1(a)(2)).

[189] Friends Opening at 44 (citing *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014)).

[190] *See* LE_000045 (explaining that former Secretary Haaland had prepared a Draft Supplemental EIS for the 2019 land exchange proposal "*[a]s a matter of policy*") (emphasis in original)).

## VI. Change in Policy

Friends of Alaska maintain that the Exchange is an "impermissible change in agency policy" because "the Secretary failed to adequately explain his reversal of agency findings rejecting a land exchange for a road."[191]

"[A] policy change complies with the APA if the agency (1) displays 'awareness that it is changing position,' (2) shows that 'the new policy is permissible under the statute,' (3) 'believes' the new policy is better, and (4) provides 'good reasons' for the new policy, which, if the 'new policy rests upon factual findings that contradict those which underlay its prior policy,' must include 'a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy.'"[192]

In *Friends of Alaska National Wildlife Refuges v. Bernhardt*, this Court found that the Secretary failed to comply with the APA standard for a policy change.[193] That case involved a 2018 Exchange Agreement between the United States and KCC to exchange lands to facilitate the construction of a road through the Refuge. The Court noted that "the Secretary has entered into an Exchange Agreement to

[191] Friends Opening at 36; *see* Friends Opening at 36-41.

[192] *Organized Vill. of Kake*, 795 F.3d at 966 (quoting *Fox,* 556 U.S. at 515-16 (emphasis omitted)).

[193] *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 381 F. Supp. 3d at 1136.

facilitate construction of a road through Izembek after previously concluding [in a 2013 Record of Decision (ROD)] that such a road would not be in the public interest."[194] The 2018 Exchange Agreement did "not address or acknowledge the 2013 ROD and its contrary findings," and thus the Court found that the Secretary "did not display 'awareness that [he was] changing position'"[195] and "impermissibly 'discard[ed] prior factual findings without a reasoned explanation.'"[196] The Court therefore found that "the Secretary's decision to enter into the Exchange Agreement constitute[d] an unlawful agency action as it is arbitrary and capricious under the APA."[197]

In contrast, here, the Secretary expressly acknowledged the 2013 EIS and ROD, including those documents' consideration of wildlife, habitat, wilderness, refuge management, and transportation alternatives.[198] The Secretary also considered a 2015 assessment of non-road alternatives prepared by the U.S. Army Corps of Engineers, the 2018 Exchange Agreement at issue in *Friends of Alaska National Wildlife Refuges v. Bernhardt* and this Court's findings, and the 2019

---

[194] *Id.* at 1139.

[195] *Id.* at 1140 (quoting *Kake*, 795 F.3d at 966 (quoting *Fox*, 556 U.S. at 515)).

[196] *Id.* (quoting *Kake*, 795 F.3d at 968).

[197] *Id.* at 1143 (citing *Kake*, 795 F.3d at 966).

[198] LE_000010-11.

Exchange Agreement that was vacated by Judge Sedwick in *Friends of Alaska I* and reversed by the Ninth Circuit in its now-vacated opinion in *Friends of Alaska II*.[199] The Secretary's Decision also recounted that in 2024 a Draft Supplemental EIS was prepared that "updated the 2013 EIS and evaluated a newly proposed potential land exchange alternative" that "involved a land exchange agreement with KCC that would convey the lands identified in the southern route in the 2013 EIS, with minor changes, to KCC in exchange for 31,198 acres of land with significant conservation, subsistence, and habitat values to the refuge system."[200]

In his rationale for approving the Exchange, the Secretary explained that his "balancing of ANILCA's purposes . . . is . . . consistent with the balancing of ANILCA's purposes by Secretary Bernhardt and in contrast with the narrow approach taken under Secretary Haaland in the 2024 Draft SEIS that omitted the economic and social needs of the State of Alaska and its people as a purpose of ANILCA to consider when evaluating an exchange under Section 1302(h)."[201] The Secretary then examined not only the impact of the Exchange on conservation and subsistence, but also the impact of the Exchange on the economic and social

---

[199] LE_000011-14.

[200] LE_000014.

[201] LE_000030.

needs of Alaska and its people, a purpose of ANILCA that was not considered by two of his predecessors, Secretary Haaland or Secretary Jewell.[202]

The Secretary also explained that he disagreed with "Secretary Jewell's portrayal of this corridor of land in Izembek Refuge and Izembek Wilderness as pristine and untrammeled, [because, in his view,] the record reflects otherwise with a significant history of use of these lands for motorized transportation on roads and trails by the U.S. military and the local population before the enforcement of regulatory restrictions in the 1960s and subsequent wilderness designation in 1980."[203] The Decision also contains an explanation by the Secretary as to why other means of transportation from King Cove to Cold Bay are not viable transportation alternatives[204] and highlights omissions from the 2013 EIS and ROD that the Secretary determined were relevant to his decision.[205]

---

[202] *See* LE_000034-40.

[203] LE_000031.

[204] LE_000039 ("A variety of alternative marine and air access methods have been evaluated over the years, as well as consideration and implementation of facility improvements, intended to provide local residents with safe and reliable access to the State of Alaska's transportation system for emergency health care (see Section 2.4[: History of Actions Related to a Potential Land Exchange]). However, none of the alternative methods of access or facility improvements have proven to be adequate in meeting the communities' underlying needs . . . .").

[205] LE_000039 ("[T]he 2013 EIS and ROD discussed the cost to the Service related to refuge management if a road is constructed, it ignored the countervailing high cost to the taxpayers of U.S. Coast Guard rescues from King Cove, of which there were 21 from January 2014 through June of 2019, at an average cost of approximately $50,000 per mission. Furthermore, the 2013 ROD failed to take into proper account that the marine transport alternatives relied upon therein would all pass through designated critical habitat for the endangered Southwest Alaska [distinct population segment] of northern sea otters, while a road, if constructed, would not pass through

The Court finds that the Decision quite adequately sets forth the reasons for the Secretary's change in policy regarding the conveyance of Refuge lands to allow for the construction of a road from King Cove to Cold Bay. In contrast to the 2018 Exchange, the Secretary here explained why he disagreed with the prior Secretaries' conclusions that the exchange of land with KCC in the Refuge would not further ANILCA's purposes. Indeed, the Secretary considered an additional purpose that those Secretaries had not considered. The Court finds that the Secretary displayed full awareness that he was changing the agency's position by relying not only on the conservation and subsistence purposes of ANILCA, but also its purpose of addressing the economic and social needs of the State and its citizens; that, as explained above, the Secretary's consideration of this additional purpose is permissible under ANILCA; that the Secretary believed the Exchange is a better policy; and that the Secretary has provided good reasons for the new policy and a reasoned explanation for his factual findings and his disagreement with the prior contradictory findings.[206] Accordingly, the Secretary did not violate the APA when he changed the agency's position in approving the Exchange.

---

any designated critical habitat.").

[206] *See Kake*, 795 F.3d at 966; *Fox,* 556 U.S. at 515-16.

## VII. Endangered Species Act

Native Villages maintain that the Secretary violated the ESA because, in their view, the Service's Biological Opinion (BiOp) that the Secretary adopted is arbitrary and capricious for "(1) failing to include an incident[al] take statement; and (2) relying on erroneous calculations to assess impacts on Steller's eiders and determine whether the action jeopardizes their continued existence."[207]

### A. Incidental Take Statement

"Section 7 of the ESA requires that federal agencies consult with the Service or [the National Marine Fisheries Service] for any agency action that 'may affect' a listed species or its critical habitat."[208] After formal consultation, the Service must prepare a BiOp "that determines whether the proposed action is likely to jeopardize the continued existence of a listed species or adversely modify its critical habitat."[209] If the consulting agency concludes that the proposed action is not likely to result in jeopardy or adverse modification, but incidental take of a protected species is "reasonably certain to occur" as a result of the agency action, then the Service must "[f]ormulate a statement concerning incidental take," referred to as

---

[207] Native Villages Opening at 34.

[208] *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 909 (2012) (first citing 16 U.S.C. § 1536(a)(2); and then citing 50 C.F.R. § 402.14(a)).

[209] *Salazar*, 695 F.3d at 909 (first citing 16 U.S.C. § 1536(b)(3)(A); and then citing 50 C.F.R. § 402.14(h)).

an Incidental Take Statement (ITS).[210] An ITS serves two main purposes: "to provide a trigger for reinitiating consultation under Section 7(a)(2) of the ESA"[211] and to provide a shield to liability for take that would otherwise be prohibited by Section 9 of the ESA.[212]

"'[T]ake' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."[213] "Incidental take" is defined as take that "result[s] from, but [is] not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant."[214] "Effects of the action" is defined by federal regulation, 50 C.F.R. § 402.02, as follows:

> Effects of the action are all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action but that are not part of the action. A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur. Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action.[215]

[210] 50 C.F.R. § 402.14(g)(7).

[211] *Id.* at 913 (first citing *Or. Natural Res. Council v. Allen*, 476 F.3d 1031, 1040 (9th Cir. 2007); and then citing *Natural Res. Def. Council, Inc. v. Evans,* 279 F. Supp. 2d 1129, 1182 (N.D. Cal. 2003)).

[212] *Id.* at 909.

[213] 16 U.S.C. § 1532(19).

[214] 50 C.F.R. § 402.02.

[215] *See* ES_085177-85228 (applying this definition).

After intra-agency formal consultation in this case, the Service prepared a BiOp in which the Service concluded that the Exchange itself "is not likely to jeopardize the continued existence of the Alaska-breeding Steller's eider or the southwest [distinct population segment of] northern sea otter."[216] The Service also concluded that the Land Exchange itself would not result in any take, and therefore it did not issue an ITS.[217] The BiOp explained:

> The Service does not anticipate any incidental take as that term is defined for purposes of consultation . . . . [I]ncidental take can only result from the conduct of the Federal agency or applicant. Here, the Federal agency's . . . conduct would be limited to entering into a land exchange that would not, by itself, cause any effects to listed species, much less take of listed species.[218]

While the Service determined that the Exchange would not "cause any effects" to Steller's eiders or the southwest distinct population segment of northern sea otters, it did "expect consequences to these resources from other activities that would be caused by the land exchange," including "construction, maintenance, and use . . . of a new road along the Izembek Isthmus to connect the communities of King Cove and Cold Bay."[219] The Service described these "effects of the action"

---

[216] ES_085232-33.

[217] ES_085234.

[218] ES_085234.

[219] ES_085226.

for the Alaska-breeding Steller's eider as a "0.7-1.7 percent reduction in normal behaviors" due to disturbance from increased vessel activity; "a 1.7 to 6.0 percent combined reduction in normal behaviors" from disturbance caused by an increase in hunting related activities; disturbance caused by an increase in off-road vehicle use; the death of one Steller's eider per year as a result of inadvertent harvest during subsistence and sport hunting activities; and the death of one Alaska-breeding Steller's eider every 6.25 to 50 years as a result of vessel strikes.[220] For the southwest distinct population segment of northern sea otters, the "effects of the action" include a disruption to normal behaviors that would lead to increased stress and energy deficits and reduced fitness due to increased vessel activity, hunting, and off-road vehicle use; the death or injury of two to four northern sea otters per year in Izembek Lagoon due to increased vessel activity after construction of the road; and the harvest of an additional eight sea otters from Izembek Lagoon each year.[221]

The Service is incorrect that an ITS is not required because "the Federal agency's . . . conduct would be limited to entering into a land exchange that would not, by itself, cause any effects to listed species, much less take of listed

[220] ES_085226.

[221] ES_085227.

species."[222] Indeed, the Exchange itself may not result in the take of any listed species. But the definition of incidental take is broader than the Service suggests: "[i]ncidental take refers to takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant" and that is "reasonably certain to occur."[223] Here, the take that the Service identified in the BiOp as reasonably certain to occur is as a result of the Land Exchange.

Further, the Service erroneously concluded that "incidental take can only result from the conduct of the Federal agency or applicant" and that the Exchange "would not, by itself, cause any effects to listed species, much less take of listed species."[224] But the regulatory definition of "[e]ffects of the action" is "all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action but that are not part of the action."[225] Indeed, the Service itself

---

[222] ES_085234.

[223] 50 C.F.R. § 402.02; 50 C.F.R. § 402.14(g)(7).

[224] ES_085234.

[225] 50 C.F.R. § 402.02.

concluded that the "effects of the [Exchange]" include take of Steller's eiders and northern sea otters.[226]

Here, because the Service "conclude[d] that the proposed action is not likely to result in jeopardy . . . , but the project nevertheless results in takings of a listed species that 'result from, but are not the purpose of, carrying out' the requested agency action," the Service was required to "include an incidental take statement in the biological opinion."[227] Its failure to do so violated the ESA.

This conclusion is supported by a case relied on by Native Villages: *Center for Biological Diversity v. U.S. Fish and Wildlife Service*.[228] There, the federal defendants argued that the plaintiff could not challenge revised forest plans because "the forest plans cannot cause incidental take because they are programmatic in nature and do not implement any actual projects."[229] According to the federal defendants, "[w]hile the biological opinions anticipated that incidental take would potentially occur, such incidental take was anticipated to occur as a result of future specific actions implemented under the guidance of the plans," but

---

[226] ES_085226-27.

[227] *Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1253 (9th Cir. 2017) (quoting 50 C.F.R. § 402.02).

[228] Native Villages Opening at 38 (citing *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.,* 623 F. Supp. 2d 1044, 1053-55 (N.D. Cal. 2009)); Native Villages Reply at 22, 24 (same).

[229] *U.S. Fish & Wildlife Serv.,* 623 F. Supp. 2d at 1051.

no take would result from the revised forest plans themselves.[230] The district court rejected that argument, finding that because "the biological opinions examine land use zone data and impact minimization measures provided by the Forest Service and use that data to assess impacts on the species in question on a species-by-species basis," the challenged "programmatic forest plan [did] have an effect upon subsequent land use decisions and therefore upon the land itself."[231] The district court concluded that by failing to issue incidental take statements with the BiOp, the agencies violated the ESA.[232]

Defendants make substantially the same argument here: that while take is anticipated to occur as an effect of the Exchange, such take would occur as the result of future actions and not due to the Exchange itself. Defendants seek to distinguish this case from *Center for Biological Diversity v. United States Fish and Wildlife Service*, contending that case involved a "materially different context involving ongoing federal forest-plan actions that continued to govern subsequent federal management and implementation," while here "[a] one-time land exchange presents no comparable ongoing federal nexus."[233] But the district court did not

---

[230] *Id.* at 1051-52.

[231] *Id.* at 1052-53 (citations omitted).

[232] *Id.* at 1055.

[233] Federal Defendants Resp. at 92.

base its decision on any "ongoing federal nexus"; rather, the district court determined that if an agency action triggers the requirement for consultation, "then it is likewise an agency action for purposes of determining when an ITS is necessary," and since consultation was required in that case, so too was an ITS required.[234]

The same is true here. The Exchange delineates the exact route the road will take through the Izembek Isthmus and includes specific provisions regarding the construction, maintenance, and operation of the road along with mitigation measures. Further, the Service assessed the impact that a road will have on protected species such that the take identified by the Service in the BiOp is incidental to the Exchange and an ITS was required.

Defendants maintain that *Town of Superior v. U.S. Fish and Wildlife Service* compels a different result.[235] In that case, the district court found that the Service did not violate the ESA in issuing an ITS that stated there would be no take in connection with a proposed land exchange for a transportation corridor.[236] The court recognized that by explicitly authorizing no take in the land exchange, that

---

[234] *U.S. Fish & Wildlife Serv.,* 623 F. Supp. 2d at 1055 (citing *Pacific Rivers Council v. Thomas,* 30 F. 3d 1050, 1053-54 (9th Cir. 1994).

[235] Federal Defendants Resp. at 91-92 (citing *Town of Superior*, 913 F. Supp. 2d at 1143-44).

[236] *Town of Superior*, 913 F. Supp. 2d at 1144.

meant that the project developer would "have to apply for an exemption from the prohibition on take."[237] Here, the Service did not issue an ITS at all, let alone one that explicitly authorized no take.[238] Therefore, *Town of Superior* does not support Defendants' assertion that an ITS was not required for the Exchange.

Finally, Defendants assert that "ESA requirements cannot impede" the Secretary's exchange authority pursuant to Section 1302(h) because Section 1302(h) authorizes exchanges notwithstanding "any other provision of law."[239] The Court finds that the ESA's requirements do not impede the Secretary's exchange authority; rather, those requirements "establish reasonable and prudent measures and terms and conditions to minimize the impact of the take."[240]

In sum, the Court finds that the Service violated the ESA by failing to issue an ITS with the BiOp and that the Secretary's reliance on the deficient BiOp was not in accordance with the law.

---

[237] *Id.* at 1143-44 (citing 50 C.F.R. § 17.40(l)(2)-(3)).

[238] *Id.* at 1144.

[239] Federal Defendants Resp. at 93-94.

[240] Native Villages Reply at 25 (first citing 16 U.S.C. § 1536(b)(4)(C); 50 C.F.R. § 402.14(i)(1); and then citing *Consejo De Desarrollo Economico De Mexicali, A.C. v. United States*, 482 F.3d 1157, 1168-69 (9th Cir. 2007) (holding that notwithstanding clauses only override conflicting provisions of law)).

### B. Errors in the Biological Opinion

Native Villages maintain that the BiOp's "no-jeopardy conclusion for Steller's eiders is premised on fundamental mathematical errors that lead to a large underestimate of effects to eiders."[241] Federal Defendants acknowledge that there were mathematical errors in the BiOp, but maintain that the Service issued a 44-page Errata in March 2026, after Native Villages identified these errors in their opening brief, correcting the errors and reaffirming the Service's conclusion that the Exchange would not jeopardize the Alaska-breeding Steller's eider or the southwest Alaska distinct population segment of the northern sea otter.[242]

Federal Defendants maintain that the Court may consider the Errata because "it officially corrects the challenged calculations and reflects the Service's own determination that those corrections do not alter the ultimate no-jeopardy conclusion."[243] Native Villages disagree, contending that the Errata is not part of the administrative record but is instead an "improper post hoc rationalization."[244]

---

[241] Native Villages Opening at 39.

[242] Federal Defendants Resp. at 94-97. This order will cite to the Errata filed at Docket 22-1 (Case No. 316) [hereinafter Errata].

[243] Federal Defendants Resp. at 99 (first citing *Camp v. Pitts*, 411 U.S. 138, 142-43 (1973); then citing *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20-21 (2020); and then citing *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 603 (9th Cir. 2014)).

[244] Native Villages Reply at 26-27.

There is no dispute that the Service issued the Errata after the Secretary approved the Exchange.[245] "It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'"[246] In *Department of Homeland Security v. Regents of the University of California*, the district court found that the Secretary of the Department of Homeland Security (DHS) had inadequately explained the basis for the agency's determination that the Deferred Action for Childhood Arrivals (DACA) program was illegal. The court remanded the case to DHS to provide a fuller explanation for its decision to rescind the DACA program.[247] In response, the DHS Secretary declined to disturb or replace the prior rescission determination but offered three reasons—including two new justifications—for the rescission of the DACA program.[248] The district court considered the new memorandum and determined it still did not provide a sufficient explanation for the rescission of DACA.[249]

---

[245] *Compare* LE_000180-90 (Land Exchange Agreement dated October 21, 2025), *with* Errata at 1 (Dated March 30, 2026).

[246] 591 U.S. at 20 (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)).

[247] *Id.* at 8-9, 12-15

[248] *Id.* at 14-15.

[249] *Id.* at 15, 20.

On appeal, the Supreme Court held that the DHS Secretary could not rely on the two new justifications in the new memorandum because they were "impermissible *post hoc* rationalizations."[250] The Supreme Court explained "[c]onsidering only contemporaneous explanations for agency action . . . instills confidence that the reasons given are not simply 'convenient litigating position[s],'" whereas "[p]ermitting agencies to invoke belated justifications, on the other hand, can upset 'the orderly functioning of the process of review,' forcing both litigants and courts to chase a moving target."[251] These "functional reasons for requiring contemporaneous explanations apply with equal force regardless whether *post hoc* justifications are raised in court by those appearing on behalf of the agency or by agency officials themselves."[252] In accord with *Department of Homeland Security*, the Court finds that it will not consider the Errata because it is a post hoc agency rationalization.

Further, the Court rejects Federal Defendants' assertion that the Errata is "not a new rationale invented in litigation," but rather "is a correction and

---

[250] *Id.* at 22.

[251] *Id.* at 23 (first quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (alterations in original); and then quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943)).

[252] *Id.* (first citing *American Textile Mfrs. Institute, Inc. v. Donovan*, 452 U.S. 490, 539 (1981); and then citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971)).

elaboration of the Service's existing rationale."[253] The Service based its no-jeopardy conclusion for Steller's eiders in the BiOp in part on its assessment that the construction of the road and the resulting increased access to the Izembek Lagoon would result in "total . . . disturbance impacts amount[] to 3.8 minutes per hour, which represents only 6.3 percent of their overall time budget," and that the Service "do[es] not expect this small increase in disturbance time and total disturbance time to result in a significant reduction in courtship behavior for the population."[254] The Errata corrected these numbers to "13.2 minutes per hour" and "28.9 percent of their overall time budget," and, as Native Villages point out, deleted the word "small" from its conclusion, "removing that basis for its decision."[255] In its Errata, the Service then added the following to the end of the sentence: "as it is unlikely that all Steller's eiders present in the lagoon will be exposed to all disturbance events at the same time or that disturbance events will occur on a continuous basis."[256] The Court agrees with Native Villages that this constitutes "a new rationale that only exists in the post-decisional Errata."[257]

---

[253] Federal Defendants Resp. at 99; *see* Federal Defendants Resp. at 97-99.

[254] ES_085231.

[255] Errata at 13; Native Villages Reply at 28.

[256] Errata at 13.

[257] Native Villages Reply at 28.

Having concluded that this Court cannot consider the Errata because it is an impermissible post hoc agency rationalization, the Court now considers whether the mathematical errors in the BiOp render it arbitrary and capricious. The BiOp states that Steller's eiders are "at the edge of their metabolic limits, spending all or nearly all their time feeding, and cannot increase foraging effort to compensate for disruptions and/or the increased energy expenditure of fleeing,"[258] and these disturbance effects would "be additive to existing stressors" and "affect a substantial portion (up to all) of the listed entity during high impact years."[259] Further, the BiOp finds that "[d]isturbance in wintering and spring staging areas may disrupt courtship behaviors, potentially reducing pair formation or reproductive timing," which can lead to population-level impacts.[260]

In addition to the erroneous calculations above regarding the disturbance to Steller's eiders, Native Villages identify other mathematical errors in the Service's estimate of hunting and boating activity in the Izembek Lagoon.[261] Native Villages explain that "[c]urrent disturbance in the Izembek Lagoon is . . . approximately 6

---

[258] ES_085180 (citation omitted); ES_085185 (citation omitted).

[259] ES_085192; *see also* ES_085187 ("Steller's eiders are considered to have overall low flexibility in their daily time budget and their energy reserves to accommodate foraging disruptions.") (citations omitted).

[260] ES_085231, ES_085189.

[261] Native Villages Opening at 41-45.

times higher than the Service's estimate"; the Service's erroneously low number was based on the assumption that hunting has increased 3-fold since the 1980s (though the BiOp suggests the increase has been much greater) and a math error halving the 3-fold increase in hunting to conclude that there would only be a 1.5-fold increase in hunting by boat in Izembek Lagoon.[262] Native Villages also maintain that "[t]here will be more than twice as many boats accessing Izembek Lagoon after the road [is built] than the Service estimate[d]."[263]

In reviewing the BiOp and Native Villages' briefing, the Court finds that the mathematical errors in the BiOp "are clearly erroneous" and "fail[] to adequately calculate that which the agency was actually trying to calculate."[264] For a species already at its metabolic limit with little time available to compensate for feeding disturbances or energy expended fleeing, a disruption to normal behavior nearly 30% of the time is certainly more significant than a disruption only 6.3% of the time. The Court finds that the mathematical errors in the BiOp are so significant that they rendered the Service's no-jeopardy determination for Steller's eiders in the BiOp arbitrary and capricious in violation of the APA.[265]

---

[262] Native Villages Opening at 41-42.

[263] Native Villages Opening at 42; *see* Native Villages Opening at 42-45.

[264] *Native Vill. of Chickaloon v. Nat'l Marine Fisheries Serv.*, 947 F. Supp. 2d 1031, 1056 (D. Alaska 2013).

[265] Federal Defendants also maintain that "[b]ecause Section 1302(h) authorizes exchanges

## VIII. Refuge Act

The Court next considers Plaintiffs' contention that the Exchange violates the Refuge Act. The Refuge Act provides that "[i]n administering the [Refuge] System, the Secretary is authorized to . . . [a]cquire lands or interests therein by exchange . . . for acquired lands or public lands, or for interests in acquired or public lands, under his jurisdiction which he finds to be suitable for disposition."[266] The provision thus requires the Secretary, before approving an exchange, to determine whether the federal refuge lands proposed for conveyance are suitable for disposition in light of their status as lands within the Refuge System and the statutory framework governing their administration.[267] Section 1302(h) of ANILCA separately provides that, "[n]otwithstanding any other provision of law," the Secretary may "exchange lands (including lands within conservation system units . . .)" when "acquiring lands for the purposes of" ANILCA.[268] Here, the Secretary found the federal lands "suitable for disposition pursuant to ANILCA" but did not

---

notwithstanding "any other provision of law," ESA requirements cannot impede that exchange authority." Federal Defendants Resp. at 93-94. Not only does this single sentence in Federal Defendants' Response fail to develop this argument, but, as discussed elsewhere in this order, the "notwithstanding" language in Section 1302(h) does not exempt exchanges from any and all other laws.

[266] 16 U.S.C. § 668dd(b)(3)(A).

[267] *Id.* §§ 668dd(a)(2)–(4), (b)(3)(A), 3144(a).

[268] *Id.* § 3192(h)(1).

make any determination as to their suitability for disposition under the Refuge Act.[269] The Court therefore considers whether the Secretary was required to determine whether the federal lands were "suitable for disposition" under the Refuge Act before approving the Exchange.

**A. Applicability of the Refuge Act**

Defenders assert that the Refuge Act's "suitable for disposition" requirement applies because ANILCA directs that Alaska refuges "shall be administered" under both ANILCA and "'the laws governing the administration of units of the National Wildlife Refuge System.'"[270] Defendants assert that Section 1302(h)'s notwithstanding clause supersedes any conflicting Refuge Act requirement and "the Improvement Act . . . establish[es] that ANILCA controls" refuges in Alaska in the event of a conflict.[271]

A notwithstanding clause generally indicates that the provision containing it "override[s] conflicting provisions" of law.[272] But "the phrase 'notwithstanding any other law' is not always construed literally," and its reach depends on "the whole

[269] LE_000055.

[270] Defenders Opening at 36-40 (quoting 16 U.S.C. § 668dd(b)(3)); Defenders Reply at 14–15.

[271] Federal Defendants Resp. at 64 (citing Pub. L. No. 105-57, § 9(b), 111 Stat. at 1260 (codified at 16 U.S.C. § 668dd note)).

[272] *Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 18 (1993) (citing *Shomberg v. United States*, 348 U.S. 540, 547–548 (1955)).

of the statutory context in which it appears."[273] Accordingly, "when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective."[274]

Here, the question presented is whether the Secretary was required to determine if the federal lands conveyed were "suitable for disposition" before approving the Exchange. On that question, the two statutes are "capable of co-existence."[275] Section 1302(h) of ANILCA authorizes the Secretary to exchange lands within conservation system units consistent with ANILCA's purposes, while Section 668dd(b)(3)(A) of the Refuge Act requires the Secretary to determine whether the federal lands conveyed in an exchange are suitable for disposition. The Secretary can give effect to both provisions by making the required suitability determination under the Refuge Act before deciding whether to approve the Exchange.

ANILCA's broader statutory framework supports that reading. Although Section 1302(h) of ANILCA supplies the authority to exchange lands within conservation system units, Section 304(a) directs that "[e]ach refuge shall be

---

[273] *Or. Nat. Res. Council v. Thomas*, 92 F.3d 792, 796 (9th Cir. 1996); *Novak*, 476 F.3d at 1046 (citing *Thomas*, 92 F.3d at 797).

[274] *Morton v. Mancari*, 417 U.S. 535, 551 (1974).

[275] *Id.*

administered" in accordance with both "the laws governing the administration of units of the National Wildlife Refuge System" and ANILCA.[276] As Defenders highlights, treating Section 1302(h)(1) as operating "entirely independently of the Refuge and Wilderness Acts" would leave Section 304(a) with little to no effect whenever the Secretary invokes Section 1302(h)(1).[277]

Congress's subsequent amendment to the Refuge Act also reinforces this reading. In 1997, Congress enacted the National Wildlife Refuge System Improvement Act ("Improvement Act"), which amended the Refuge Act.[278] As Defenders highlight, Congress expressly identified certain the circumstances in which Alaska refuges would be governed by ANILCA rather than the Refuge Act.[279] For example, Section 7 of the Improvement Act, which requires the Secretary to prepare a comprehensive conservation plan for each refuge, exempts "refuge lands in Alaska" from that requirement, and provides that such lands "shall be governed by the refuge planning provisions of [ANILCA]."[280] And Section 9 expressly provides that "[i]f any conflict arises between any provision of this Act

---

[276] 16 U.S.C. § 3144(a).

[277] Defenders Reply at 14–15 (first citing Federal Defendants Resp. at 62; then citing State Resp. at 34; and then citing KCC Resp. at 63-64).

[278] Pub. L. No. 105-57, 111 Stat. 1252.

[279] Defenders Opening at 39-40; Defenders Reply at 21-22.

[280] Pub. L. No. 105-57, § 7, 111 Stat. at 1257 (codified at 16 U.S.C. § 668dd(e)(1)(A)).

and any provision of [ANILCA], then the provision in [ANILCA] shall prevail."[281] By contrast, when Congress amended the Refuge Act's exchange provision in the same legislation, it left the "suitable for disposition" requirement applicable to all refuge lands, without creating an exception for Alaska refuges.[282] The Court therefore agrees with Defenders' observation that "[w]here Congress intended Alaskan refuges to be treated differently, it said so."[283]

Further, Section 9 of the Improvement Act does not eliminate the Secretary's obligation to make the threshold suitability determination under the Refuge Act. Section 9 provides that ANILCA prevails "[i]f any conflict arises."[284] If the Secretary were to determine that the lands conveyed in the Exchange are not suitable for disposition under the Refuge Act but should nonetheless be exchanged pursuant to Section 1302(h), it might then become necessary to decide whether that adverse suitability determination creates a conflict with Section 1302(h) and, if so, whether Section 1302(h)'s notwithstanding clause or Section 9 resolves that conflict in favor of ANILCA such that the exchange should nonetheless proceed. But because the

---

[281] *Id.* § 9(b), 111 Stat. at 1260 (codified at 16 U.S.C. § 668dd note).

[282] *Id.* § 5(b), 111 Stat. at 1256 (codified at 16 U.S.C. § 668dd(b)(3)).

[283] Defenders Reply at 21–22 (citing State Resp. at 24-25, 39).

[284] Pub. L. No. 105-57, § 9(b), 111 Stat. at 1260 (codified at 16 U.S.C. § 668dd note).

Secretary made no Refuge Act determination here, the Court need not decide those questions.

Taken together, the statutes require the Secretary to determine whether Alaska refuge lands are suitable for disposition under Section 668dd(b)(3)(A) before conveying those lands in an exchange authorized by Section 1302(h).[285] The Court therefore finds that the Secretary was required to make the determination prescribed by Section 668dd(b)(3)(A) before approving the Exchange.

### B. Compliance with the Refuge Act

Defendants assert that even if the Refuge Act's "suitable for disposition" requirement applies to the Exchange, the Secretary's finding that the federal lands were "suitable for disposition pursuant to ANILCA" satisfies any applicable requirement and that the substance of this determination is committed to the Secretary's discretion.[286] Defenders respond that the Secretary did not make the required determination because the Decision expressly disclaims the need to determine whether the lands were suitable for disposition under the Refuge Act.[287]

[285] 16 U.S.C. §§ 3144(a), 3192(h)(1), 668dd(b)(3)(A).

[286] Federal Defendants Resp. at 65, 68 (quoting LE_000055).

[287] Defenders Opening at 36-40; Defenders Reply at 22-24 (citing LE_000054–55).

Here, the Secretary found that the federal lands conveyed in the Exchange were "suitable for disposition pursuant to ANILCA," but expressly stated that he had "not made the determination identified in the 2024 Draft SEIS as being required by the provisions of the [Refuge Act]."[288] The Secretary also rejected the 2024 Draft SEIS's conclusion "that the land exchange must further the missions of the Izembek Refuge and the Refuge System."[289] Defendants nevertheless assert that a Refuge Act determination would have required nothing more than the determination the Secretary made under ANILCA, noting that Plaintiffs do not identify "what more their desired suitability determination would have entailed."[290] But that assertion cannot be reconciled with the Secretary's own finding that "[t]he conservation mission set forth in the Improvement Act is in conflict with Section 1302(h) of ANILCA" because ANILCA's purposes "are broader than the mission of the Izembek Refuge and the mission of the Refuge System."[291] It was on that basis that the Secretary found the federal lands "suitable for disposition pursuant to ANILCA" and declined to make the determination required by the Refuge Act.[292]

---

[288] LE_000054-55 (citing Pub. L. No. 105-57, 111 Stat. 1252 (codified at 16 U.S.C. §§ 668dd-ee)).

[289] LE_000055 (footnote omitted).

[290] Federal Defendants Resp. at 65 (citing Defenders Opening at 36-40).

[291] LE_000055.

[292] LE_000055.

Therefore, by the Secretary's own account, the ANILCA and Refuge Act inquiries are not interchangeable and the Court cannot treat the Secretary's ANILCA finding as satisfying the Refuge Act's suitability determination that the Secretary expressly declined to apply.

Federal Defendants also assert that the Secretary's suitability determination is committed to agency discretion and therefore unreviewable.[293] However, Defenders do not challenge how the Secretary exercised his discretion under the Refuge Act. Rather, Defenders challenge the Secretary's failure to make a Refuge Act suitability determination at all.[294]

Based on the foregoing, the Court finds that the Secretary acted contrary to law by authorizing the Exchange without determining whether the federal lands were "suitable for disposition" pursuant to Section 668dd(b)(3)(A) of the Refuge Act.[295] Because the Secretary's failure to make the required Refuge Act determination is dispositive, the Court does not reach Defenders' separate contention that the Exchange violates the Refuge Act's management directives.[296]

---

[293] Federal Defendants Resp. at 65–67; *see* 5 U.S.C. § 701(a)(2).

[294] Defenders Reply at 22-23; *see* 5 U.S.C. § 706(2).

[295] 5 U.S.C. § 706(2)(A), (C); 16 U.S.C. § 668dd(b)(3)(A).

[296] *See* Defenders Opening at 40-48.

## IX. Wilderness Act

Defenders maintain that the Exchange also violates the Wilderness Act, which provides that "there shall be no commercial enterprise and no permanent road within any wilderness area designated by [this Act]."[297] Defenders maintain that "[e]ven if Federal Defendants could lawfully dispose of a road corridor through Izembek wilderness lands . . . they have also violated their obligation to manage Izembek's surrounding wilderness areas by preserving their wilderness character, consistent with the Wilderness Act."[298] Defenders note that while a road could be authorized through a wilderness area if Congress approved it pursuant to Title XI, here, the Secretary did not seek or obtain congressional approval.[299] Because the Court finds that Title XI applies and the Secretary's failure to comply with Title XI was unlawful, the Court need not reach the question of whether the Exchange also violates the Wilderness Act.

---

[297] 16 U.S.C. § 1133(c); Defenders Opening at 48 (citing 16 U.S.C. § 1133(c)).

[298] Defenders Opening at 53.

[299] *See* Defenders Reply at 26 ("Moreover, whatever Congress' intentions for § 1302(h)(1) as a general mechanism to dispose of Alaskan wilderness lands, its intentions on exchanges to enable roads through wilderness are clear. Congress reserved the exclusive authority to waive the Wilderness Act's prohibitions on a permanent road through Alaskan wilderness via Title XI's detailed requirements.").

### X. Remedy

Plaintiffs seek vacatur of the Exchange.[300] Federal Defendants respond that "[v]acatur would impose not only expensive delays but also serious risk to human life."[301] Federal Defendants further contend that the Exchange is "critical to the very continuance of the King Cove community" because its "medical, economic, and subsistence situation has become so dire" that the "road 'is crucial for them to continue living in King Cove.'"[302]

Vacatur is the presumptive remedy under the APA.[303] A reviewing court is required to "hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[304] A limited exception exists "when equity demands."[305] "When determining whether to leave an agency action in place on remand," a court

---

[300] Native Villages Opening at 45-47; Friends Opening at 45-48; Defenders Opening at 58.

[301] Federal Defendants Resp. at 100.

[302] Federal Defendants Resp. at 100 (quoting LE_000038).

[303] *Alliance for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018).

[304] 5 U.S.C. § 706(2).

[305] *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (quoting *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995)).

must "weigh the seriousness of the agency's errors against 'the disruptive consequences of an interim change that may itself be changed.'"[306]

The balance clearly favors vacatur here because the Secretary's errors go to the fundamental illegality of the Exchange.[307] The Exchange was effectuated without compliance with Title XI of ANILCA, the ESA, and the Refuge Act; those defects cannot be cured through further explanation on remand. And specific as to Title XI, because the Secretary did not comply with the requirements of that title, the Exchange has no "force and effect."[308]

Defendants maintain that vacatur is not an appropriate remedy, relying on *Seven County* and *Angoon v. Hodel*.[309] In *Seven County*, the Supreme Court held that "[e]ven if an EIS falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project,

---

[306] *Id.* (quoting *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012)).

[307] The Court observes that Defendants rely on the benefits of the proposed road in support of the Secretary's justification for authorizing the Exchange under Section 1302(h) and on mitigation measures regarding the proposed road in finding that the Exchange is permitted under Section 810 of ANILCA. But then Defendants contend that the Exchange does not itself authorize the construction of a road and so other statutes do not apply, such as Title XI and the ESA's requirement that the Service issue an ITS. While the Court recognizes that there may be nuance as to when various statutes apply to multi-step projects, the Court has strived to interpret these statutes in a manner that gives effect to Congress's intent in each statute and "with a view to [each statute's] place in the overall statutory scheme." *King v. Burwell*, 576 U.S. at 486.

[308] 16 U.S.C. § 3164(a).

[309] Federal Defendants Resp. at 100 (first citing *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 184-85; and then citing *Angoon v. Hodel*, 803 F.2d 1016, 1022 (9th Cir. 1986)).

at least absent reason to believe that the agency might disapprove the project if it added more to the EIS."[310] The Supreme Court explained that "[t]he ultimate question is not whether an EIS in and of itself is inadequate, but whether the agency's final decision was reasonable and reasonably explained."[311]

*Seven County* stressed that a court "must keep in mind that review of an agency's EIS is not the same thing as review of the agency's final decision concerning the project," as NEPA is "purely a procedural statute."[312] Here, the Court has found that the Secretary committed legal errors in the final Decision approving the Exchange that are considerably more serious than a deficient EIS; specifically, the Secretary violated Title XI of ANILCA, the ESA, and the Refuge Act. In light of these errors, the Court has found that the Secretary's final decision is not in accordance with the law such that vacatur is the appropriate remedy.

Federal Defendants contend that in *Angoon*, the "Ninth Circuit explained that the seven-year delay since exchange negotiations began counseled against vacatur given the Native Corporation's 'urgent' economic need to use the land."[313] But in *Angoon*, the Ninth Circuit not only reversed the district court's vacatur

---

[310] *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 185.

[311] *Id.* at 184-85.

[312] *Id.* at 184-85.

[313] Federal Defendants Resp. at 100 (quoting *Angoon*, 803 F.2d at 1021-22).

decision, but also reversed the district court's merits determination that the EIS violated NEPA.[314] Here, the Court has found several legal errors with the Secretary's merits determination, warranting vacatur.

The Court acknowledges the hardships identified by Federal Defendants and the serious concerns of the residents of King Cove that have sought for decades to have a road to Cold Bay constructed. But those circumstances cannot justify keeping in place an unlawful land exchange that would allow road construction to proceed.[315]

## CONCLUSION

Based on the foregoing, NANA's motions at Docket 34 in Case No. 316 and at Docket 34 in Case No. 318 are each **DENIED as moot.** Federal Defendants' Motion for Judicial Notice in Case No. 3:25-cv-00316-SLG at Docket 23, Case No. 3:25-cv-00318-SLG at Docket 24, and Case No. 3:25-cv-00319-SLG at Docket 32 are each **GRANTED**.

---

[314] *Angoon*, 803 F.2d at 1022 ("[W]e conclude that the EIS in issue here was adequate because it discussed all the alternatives that were reasonably necessary to enable the Corps to make an informed decision to grant the log transfer facility permit. We reverse the district court's judgment insofar as it invalidates the permit and enjoins use of the log transfer facility.").

[315] On July 24, 2026, the State filed a notice regarding the anticipated construction timeline. *See* Docket 43 (State of Alaska and KCC's Supp. Notice of Construction Timeline) at 3 (Case No. 316) ("The State is now certain that road construction will not commence until at least September 1, 2026.").

Plaintiffs' Motions for Summary Judgment in Case No. 3:25-cv-00316-SLG at Docket 16, Case No. 3:25-cv-00318-SLG at Docket 17, and Case No. 3:25-cv-00319-SLG at Docket 23 are each **GRANTED in part and DENIED in part**. The Court finds for Plaintiffs as to their ANILCA Title XI,[316] ESA, and Refuge Act claims. The State's Motion for Summary Judgment in Case No. 3:25-cv-00316-SLG at Docket 21, Case No. 3:25-cv-00318-SLG at Docket 22, and Case No. 3:25-cv-00319-SLG at Docket 29 is **GRANTED in part and DENIED in part**. The Court finds for Defendants as to Plaintiffs' claims under ANILCA Section 1302(h), ANILCA Section 810, and NEPA claims, and Plaintiffs' change of policy claim under the APA.

In light of the foregoing, **IT IS ORDERED** that the Secretary's Decision approving the Land Exchange between the Secretary and King Cove Corporation dated October 21, 2025 is **VACATED.**

The Clerk of Court is directed to enter final judgment in this case.

IT IS SO ORDERED this 17th day of August, 2026, at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

[316] In light of the Court's findings regarding Title XI, the Court does not reach Defenders' Wilderness Act claim.